MARTIN INVESTORS, INC.,
Respondent,

v.

Leonard H. VANDER BIE, et
al., Appellants.

No. 48017.

Supreme Court of Minnesota.

July 28, 1978.

Hugh J. D. Bishop and Lester Sokol, Minneapolis, for appellants.

Blethen, Gage, Krause, Corcoran, Berkland & Peterson and Stephen Rolfsrud, Mankato, for respondent.

Heard before ROGOSHESKE, TODD and WAHL, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

Defendants Computer Capital Corporation (CCC) and named individuals appeal from a judgment finding them in violation of the Minnesota Franchises Act, Minn.St. c. 80C, and guilty of common-law fraud and, upon these grounds, awarding plaintiff, Martin Investors, Inc., (Martin Investors) rescission of the contract between the parties and recovery of amounts expended thereunder. We hold that CCC was correctly found to have offered a franchise for sale within this state without having an effective registration statement on file with the state commissioner of securities, in violation of c. 80C; and without reaching the issue of potential common-law fraud, we affirm the judgment granting plaintiff rescission of the contract and restitution of sums expended under Minn.St. 80C.17, but order a remittitur in the sum of $250.

CCC is a New York corporation with principal offices in California. It maintains a computerized data base in California containing profiles of over 2,000 lenders or investors and derives its income from the sale of its computer service matching the needs of potential borrowers to potential

lenders throughout the United States. CCC sells its services directly to individual borrowers in California and also through intermediaries, called consultants or correspondents, in California and other states. These affiliates or consultants sell CCC's services within states outside of California by soliciting and interviewing potential borrowers to determine the nature of their proposed ventures and capital needs and, upon payment of a fee by the borrower, compiling and forwarding this information to CCC's California offices, where a computer search of CCC's data base is run to locate suitable potential lenders.

In response to a CCC advertisement in the Wall Street Journal, Christopher Faye, a resident of Mankato, wrote to CCC's California address in May 1975 expressing interest in becoming a CCC consultant. In a telephone conversation in May 1975 with Albert Colby, then marketing director of CCC, Faye and his business partner, Allen Ackland, also of Mankato, asked whether CCC was in compliance with all applicable state and Federal regulatory laws. Colby assured them that it was. In response to Faye's inquiries, CCC sent a sample copy of its consultant agreement to Faye in Minnesota. Faye prepared a proposed agreement incorporating most of the CCC form with certain changes suggested by Faye or his attorney.

In early June 1975, Faye and Ackland flew to California, where they presented at the CCC offices Faye's version of the proposed consultant agreement to Colby and John Ashley, president of CCC. While in California, Faye and Ackland signed that proposed agreement on behalf of a corporation yet to be formed by them to function as a CCC consultant or affiliate within Minnesota. Colby witnessed the signing by Faye and Ackland, but the contract was not signed by CCC at that time pending later approval by the CCC board of directors.

While in California, Faye and Ackland, under the terms of the agreement, paid $10,000 cash plus a 60-month, $20,000 promissory note as "advance part payment and performance guarantee" for 150 units of computer service ordered from CCC. The corporation to be formed as the consultant agreed to pay a total of $400 for each computer service used, and out of each $400 paid, CCC agreed to credit $200 on the balance of the promissory note during the 60-month term. In addition, CCC was to receive 1 percent of the funds of each loan actually placed through use of its service. The consultant also agreed to pay $250 a month as a share in the cost of CCC's national advertising. In exchange, the consultant would be granted an exclusive territory within which it was to have "exclusive rights to utilize [CCC's] lists, mailing service, methods, systems and trade secrets." Potential borrowers within that territory who responded directly to CCC's national advertising were to be referred by CCC's California office to the corporation Faye and Ackland would form.

Before leaving California, Faye and Ackland participated in a training session at the CCC office at which Colby and Ashley explained suggested methods of operation as a CCC consultant. They were given a copy of an audio-visual presentation used to sell CCC's services, copies of two different CCC brochures, a fee schedule, and agreement and forms to be filled out by potential borrowers, and other printed materials, all bearing CCC's name. A page of printed instructions given them called for use of the audio-visual presentation and the brochures and other forms naming CCC in the conduct of client interviews as a CCC consultant. Faye and Ackland testified that Ashley and Colby also verbally instructed them to use the materials naming CCC, although Ashley testified that he generally instructed all new consultants not to use the CCC name in selling its services and that he "hoped" Faye and Ackland would edit the film strip and other materials to remove CCC's name before using them.

Both Faye and Ackland testified that while in California they asked and were again assured that CCC was in compliance with all state and Federal laws. They also said that Colby and Ashley stated to them as fact that CCC was not a franchise opera-

tion. No one associated with CCC informed them that CCC had received notification from the Minnesota Department of Commerce of potential violation of the Minnesota Franchises Act through failure to register with that department. It is undisputed that at no time during the offer, acceptance, or performance of CCC's contract with the corporation formed by Faye and Ackland did CCC have an effective registration statement on file with the Department of Commerce under the provisions of the Franchises Act.

Faye and Ackland returned to Minnesota on June 8, 1975, and immediately commenced selling CCC's services in Minnesota. They were informed in letters dated June 9 and June 25, 1975, directed to Faye in Minnesota, from Leonard Vander Bie, chairman of the CCC board of directors, that CCC had accepted the contract which they signed subject to certain minor changes that were later accepted by Faye and Ackland. Ashley testified that he signed the contract on behalf of CCC in California during the latter part of June 1975, but a copy of the contract with CCC's signature was never forwarded to Faye and Ackland. Martin Investors was incorporated by Faye and Ackland on July 3, 1975, to function as the CCC consultant pursuant to the contract. As the principal officers and shareholders of Martin Investors, Faye and Ackland continued to act for the corporation.

While functioning as a CCC consultant during June, July, and August 1975, Martin Investors made sales presentations using the audio-visual presentation, brochures, and other materials bearing CCC's name that were given to Faye and Ackland in California and later supplied to Faye by a CCC employee in quantities of over 300. On one occasion, Vander Bie instructed Faye in a letter dated July 30, 1975, that CCC was not a franchise operation and that its name was not to be used in selling its service in Minnesota. Faye testified that he continued to use materials bearing CCC's name but inserted a clause on each agreement with a borrower to the effect that CCC was not a party to such agreement, believing that would satisfy Vander Bie's concerns. CCC made no further protest. During its period of operation, Martin Investors purchased CCC's services for two clients, for which it paid $800 and collected a total of $3,500 in fees from the clients. Of the latter amount, $2,500 was refunded to one of the clients because of an alleged unrelated securities violation by CCC.

Faye received a letter on August 22, 1975, from the senior securities examiner of the Department of Commerce that stated CCC was under investigation for suspected violation of the Franchises Act by failing to register its contracts with the state and requested Faye to provide certain information regarding Martin Investors' contract with CCC. After receipt of this letter and upon advice of counsel, Martin Investors ceased doing business as a CCC consultant and mailed a notice of rescission of its contract to CCC.

Martin Investors instituted this action on January 9, 1976, seeking rescission of the contract between the parties and recovery of sums expended on account of the contract. The complaint alleged violations of the Minnesota Securities Act (§§ 80A.01 and 80A.23, subd. 2), the Franchises Act (c. 80C), and common-law fraud by CCC and Vander Bie and Ashley as chairman of the board and president of CCC. Following 2 days of trial before the court sitting without a jury,[1] the court entered findings of

1. The senior securities examiner for the Minnesota Department of Commerce testified that his department had notified CCC of potential violations of the Franchises Act by letter dated October 24, 1973, nearly 2 years before entry of the contract in the present case. The department sent similar letters again notifying CCC of potential violations on January 7, 1974, and May 21, 1975. As suggested by the department, CCC formally requested an interpretive opinion by that department on June 9, 1975, as to whether it was in violation of the Franchises Act. The department issued an interpretive opinion on June 23, 1975, finding that CCC was a franchise operation and was in violation of Minn.St. c. 80C for failure to register. On July 9, 1976, the department issued a cease-and-desist order to CCC pursuant to authority granted in § 80C.12. CCC's request for hearing on that matter, filed January 2, 1977, was still pending at the time of trial in this case.

fact, conclusions of law, and an order for judgment. The findings of the trial court which are challenged on this appeal by CCC and the individual defendants may be summarized as follows:

1. That the agreement between Martin Investors and CCC did constitute a franchise under § 80C.01, subd. 4, and CCC was in violation of § 80C.02 by having offered or sold a franchise in this state without its effective registration statement on file in accordance with §§ 80C.01 to 80C.22.

2. That CCC and the named individual defendants committed fraud by "knowingly and falsely concealing the highly material fact of their difficulties with the state of Minnesota on the franchising question" and by falsely representing that CCC had complied with all the laws of Minnesota, causing Martin Investors reasonably to rely upon those representations and to sustain damages as a result.

3. That under the provisions of § 80C.17 Martin Investors is entitled to recover damages of $20,593.02, including $5,400 for pretrial legal expense, $1,505 for trial-related legal expense, and return of its $10,000 downpayment and $20,000 promissory note that was declared null and void.[2]

1. CCC and the individual defendants argue that the trial court erred in awarding rescission and recovery of expenses under the Franchises Act because CCC did not offer or sell a franchise within the state so as to invoke the jurisdiction of the act, and because the CCC–Martin Investors contract

was not a franchise within the meaning of the act.

We have not before been asked to apply the registration requirement and civil liability provisions of c. 80C. Chapter 80C was adopted in 1973 as remedial legislation designed to protect potential franchisees within Minnesota from unfair contracts and other prevalent and previously unregulated abuses in a growing national franchise industry. See, Note, 59 Minn.L.Rev. 1027, 1036. Like most other states' franchise regulation acts, all of relatively recent passage, c. 80C seeks to achieve this protection principally through requiring that any person offering or selling a franchise within the state shall register with the commissioner of securities a proposed public offering statement, making full disclosure of all facts required by statute or rules of the commissioner. See, §§ 80C.04 and 80C.06. The franchiser is required to present the public offering statement to each prospective franchisee at least 7 days before any franchise contract is entered or any consideration is paid by the franchisee. § 80C.06, subd. 5. The person offering or selling a franchise must file an annual report with his registration, § 80C.08, and also keep a set of books and records open to inspection by the commissioner. § 80C.10. The commissioner is given power to deny, suspend, or revoke registration upon any of the grounds stated in § 80C.12 or to impose such conditions, limitations, or restrictions as he deems necessary to carry out the purposes of the act. § 80C.15. Failure to register a franchise contract "offered or sold" within Minnesota violates § 80C.02[3] and subjects the franchiser to liability for

2. Although the judgment does not specifically state that the contract between the parties is rescinded, that result is effectively brought about by the restitution of the entire $30,000 ($10,000 cash and $20,000 promissory note) which was paid by Martin Investors as consideration for CCC's execution of and obligation under the contract.

The court also found that no violation of Minnesota securities laws had been proved because the promissory note executed by Faye on

behalf of the corporation did not constitute a security within the meaning of § 80A.14(q). This finding is not challenged.

3. Section 80C.02 provides: "No person may offer or sell any franchise in this state unless there is an effective registration statement on file in accordance with the provisions of sections 80C.01 to 80C.22 or unless the franchise or transaction is exempted under section 80C.03."

damages, rescission, or such other relief as the franchisee may seek under § 80C.17.[4]

It is undisputed that CCC has not complied with any of the registration provisions. The act therefore applies to impose civil liability if CCC was offering or selling a franchise in Minnesota and if Martin Investors' contract with CCC constitutes a franchise within the statute.

CCC made an offer or sale in Minnesota within the meaning of § 80C.02 if it made an offer to sell in Minnesota, or alternatively if an offer to purchase originated in and was accepted in this state. § 80C.19.[5] Upon the record before us, we find that both of these alternative preconditions to the act's jurisdiction are satisfied.

Under § 80C.19, subd. 2, an offer to sell is made in this state when it is "directed by the offeror to this state and received by the offeree in this state." "Offer" or "offer to sell" is defined in § 80C.01, subd. 16, as "every attempt to offer to dispose of, and every solicitation of an offer to buy, a franchise or an interest in a franchise for value." An advertisement in a newspaper published within Minnesota may constitute an offer to sell within the state, but an advertisement in a newspaper published outside Minnesota but circulated within the state is not considered an offer to sell made within the state. See, §§ 80C.19, subd. 4, and 80C.09.

Within these provisions, a number of CCC's activities may be construed as an offer to sell within Minnesota. It published advertisements for consultants in at least two newspapers published within Minnesota. See, §§ 80C.09 and 80C.19. In response to Faye's inquiries after he saw the same advertisement, although in a nationally circulated newspaper, a CCC agent discussed the proposed consultant arrangement in a long-distance telephone call with Faye, who was within Minnesota. CCC then mailed a sample copy of its standard consultant agreement to him in Minnesota.

▪ Considering all of these acts by CCC, and particularly the mailing of a sample contract to Faye in this state, we find that CCC did make an offer to sell within the state which justified the application of c. 80C. Through these activities, CCC directly induced a Minnesota resident to enter a contractual relationship upon essentially all of the terms proposed in the sample consultant agreement forwarded to Faye but without the benefit of the full disclosure provided by the registration requirements of the Franchises Act. This is precisely the kind of activity that our act was designed to regulate and that must be subjected to the requirements of registration and full disclosure if the protective purposes of the act are to be realized.

CCC argues that the sample agreement that it sent into Minnesota should not be construed as an offer to sell because it was marked "sample" and because Faye in effect made a counteroffer to purchase by altering certain terms. We find the suggestion of CCC that an offer in the strictest

4. See, footnote 10, infra.

5. Section 80C.19 provides: "Subdivision 1. The provisions of sections 80C.01 to 80C.22 concerning sales and offers to sell shall apply when a sale or offer to sell is made in this state or when an offer to purchase is made and accepted in this state.

"Subd. 2. For the purpose of sections 80C.01 to 80C.22, an offer to sell or to purchase is made in this state, whether or not either party is then present in this state, when the offer originates from this state or is directed by the offeror to this state and received by the offeree in this state.

"Subd. 3. For the purpose of this section, an offer to purchase or to sell is accepted in this state when acceptance is communicated to the offeror in this state, and has not previously been communicated to the offeror, orally or in writing, outside this state; and acceptance is communicated to the offeror in this state, whether or not either party is then present in this state, when the offeree directs it to the offeror in this state reasonably believing the offeror to be in this state and it is received by the offeror in this state.

"Subd. 4. An offer to sell or to purchase is not made in this state when the publisher circulates or there is circulated in his behalf in this state any bona fide newspaper or other publication of general, regular and paid circulation which is not published in this state, or when a radio or television program originating outside this state is received in this state."

sense of contract law must be shown requires too narrow a reading of this remedial statute. Minnesota has a legitimate interest in extending the requirements of its act to protect against activities within the state directed at inducing its residents to enter a franchise relationship that, without full disclosure, could lead to the kind of abuses the act is intended to regulate.

Upon this record, there was not only an offer to sell within Minnesota but there is also evidence sufficient to justify a finding that an offer to purchase was made and accepted in this state. Under § 80C.19, subd. 2, an offer to purchase is made in Minnesota "when the offer originates in this state." An offer to purchase is accepted in this state "when the offeree directs [the acceptance] to the offeror in this state reasonably believing the offeror to be in this state and it is received by the offeror in this state." § 80C.19, subd. 3. Faye had a proposed contract prepared in Minnesota, suggesting a few changes in the CCC form agreement. If Faye's proposal is construed as an offer to purchase, as CCC now suggests it should be, the offer to purchase clearly originated in Minnesota. While Faye and Ackland signed the proposed agreement in California, CCC did not then sign and acceptance by the CCC board of directors was first communicated to Faye and Ackland by letters from defendant Vander Bie directed to Faye in Minnesota.

Thus it is clear that the jurisdictional requirement of the act is satisfied under § 80C.19, and CCC was properly found to have made an offer or sale within Minnesota without having an effective registration statement on file.

We turn now to the question of whether the contract that was sold to Martin Investors constitutes a "franchise" within the statute. "Franchise" is defined by § 80C.01, subd. 4,[6] as including three elements: (1) A right granted to the franchisee to engage in business using the franchiser's trade name or other commercial symbol, (2) a "community of interest" in the marketing of goods or services between the franchisee and franchiser, and (3) a "franchise fee" paid by the franchisee.

■ CCC and the individual defendants have conceded in their appellate brief that there was sufficient evidence of record to support a finding that Martin Investors was given the right to use CCC's name in its business of selling CCC's services through use of the audio-visual presentation and other brochures and printed materials that were supplied by CCC. In oral argument, however, defendants' counsel contended that § 80C.01, subd. 4, should be construed to find a "franchise" only where the franchisee is given the contractual right to hold itself out for business under the name of the franchiser, that is, only if the contract had accorded Martin Investors the right to hold itself out as CCC should it be found a franchise. We do not read such a requirement in the statute. The statute requires only that the franchisee be granted the right to use the franchiser's name, not that it be permitted to hold itself out as the franchiser.

■ We are also convinced, as stated by the trial court, that—

"* * * [t]here was a community of interest between plaintiff and CCC in the ongoing relationship that was contemplated and from which each would share in fees from a common source, the eventual borrower. The computer data bank was the common source of the service provided by franchisor and franchisee."

---

**6.** Section 80C.01, subd. 4, provides in pertinent part: " 'Franchise' means a contract or agreement, either express or implied, whether oral or written, for a definite or indefinite period, between two or more persons:

"(a) by which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service mark, logotype, advertising, or other commercial symbol of related characteristics;

"(b) in which the franchisor and franchisee have a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise; and

"(c) for which the franchisee pays, directly or indirectly, a franchise fee."

CCC's contractual right to 1 percent of the proceeds of each loan placed by the consultant gave it a clear "community of interest" in the consultant's marketing of its services, which satisfied the second requirement for finding a franchise under the act. We find no merit in CCC's contention that 1 percent of total proceeds is not substantial enough to create a "community of interest." [7] The statutory definition contains no substantiality requirement.

█ Finally, it is clear that the initial $30,000 investment by Martin Investors, the 1-percent share of loan proceeds reserved to CCC, and the $400 that the contract required Martin Investors to pay CCC for each unit of computer service purchased, all constitute a "franchise fee" as that third franchise element is broadly defined in § 80C.01, subd. 9.[8]

█ The contract between CCC and the corporation formed by Faye and Ackland was properly determined to be a franchise within the statute. We hold that CCC, having offered and sold a franchise within Minnesota without having on file an effective registration statement under the act, was properly found to have violated § 80C.02, entitling Martin Investors to remedies under § 80C.17.[9]

2. Having held CCC in violation of the Franchises Act, as did the trial court, we conclude that the trial court's findings of common-law fraud by CCC and the individual defendants were unnecessary to its award, and we do not review those findings.

█ 3. The trial court in fact based its award of what it called "damages" exclusively upon the rights of action granted to the franchisee, Martin Investors, under § 80C.17.[10] Some confusion was generated

---

7. It is significant that CCC sought borrowers in need of substantial venture capital.

8. Section 80C.01, subd. 9, provides: " 'Franchise fee' means any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of *an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales* whether or not referred to as royalty fees, *any payment for goods or services,* or any training fees or training school fees or charges; provided, however, that the following shall not be considered the payment of a franchise fee:

"(a) The purchase of goods or agreement to purchase goods at a bona fide wholesale price;

"(b) The purchase of goods or agreement to purchase goods on consignment, if the proceeds remitted by the franchisee from any such sale shall reflect only the bona fide wholesale price of such goods;

"(c) The repayment by the franchisee of a bona fide loan made to the franchisee from the franchisor;

"(d) *The purchase of goods or agreement to purchase goods at a bona fide retail price* subject to a bona fide commission or compensation plan that in substance reflects only a bona fide wholesale transaction;

"(e) The purchase, at their fair market value, of supplies or fixtures or agreement to so purchase supplies or fixtures necessary to enter into the business or to continue the business under the franchise agreement;

"(f) The purchase or lease, at the fair market value, of real property or agreement to so purchase or lease real property necessary to enter into the business or to continue the business under the franchise agreement." (Italics supplied.)

CCC's argument that the $400 fee was for a purchase of "goods" at wholesale exempted from the Franchises Act under § 80C.01, subd. 9(a), is without merit. That provision exempts wholesale purchases of goods, not services such as those marketed by CCC.

9. See, footnote 10, infra.

10. Section 80C.17 provides: "Subdivision 1. A person who violates any provision of sections 80C.01 to 80C.03 and 80C.15 to 80C.22 or any rule or order thereunder shall be liable to the franchisee or subfranchisor who may sue for damages caused thereby, for rescission, or other relief as the court may deem appropriate.

"Subd. 2. Every person who directly or indirectly controls a person liable under subdivision 1, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions and every employee of a person so liable who materially aids in the act or transaction constituting the violation is also liable jointly and severally with and to the same extent as such person, unless the person who would otherwise be liable hereunder had no knowledge of or reasonable grounds to know of the existence of the facts by reason of which the liability is alleged to exist.

"Subd. 3. Any suit authorized under this section may be brought to recover the actual

by the mischaracterization of this award as damages. CCC argues that Martin Investors must be put to an election of remedies and may not have both rescission of its contract and damages. In effect, Martin Investors was not granted damages but rather rescission of its contract with restitution of sums expended in setting up a business under the contract in order to place both parties at status quo ante the contract. See, e. g., *Weatherston's Assoc. Services v. Minnesota Mut. L. Ins. Co.,* 257 Minn. 184, 100 N.W.2d 819 (1960); *Cut Price Super Markets v. Kingpin Foods, Inc.,* 256 Minn. 339, 98 N.W.2d 257 (1959). This is a remedy specifically authorized by § 80C.17, subd. 1. The individual defendants Vander Bie and Ashley, who were chairman of the board and president of CCC, were properly held liable along with CCC for the restitution of sums due Martin Investors under the express provisions of § 80C.17, subd. 2.

The trial court determined the expenses for which it allowed restitution through a very careful and detailed analysis of all expenses claimed. In the process, several of Martin Investors' claims were disallowed or reduced. CCC and the individual defendants argue for the first time on appeal that certain of the amounts awarded were excessive in that they include the value of benefits retained by Martin Investors. These arguments were not presented to the trial court by post-trial motion, as they might have been. We have nevertheless examined the items awarded and find them to be reasonable and to represent amounts expended for which no significant redeemable value has been retained by Martin Investors. With regard to audio-visual expenses, the record does show that Martin Investors retained two projectors, one with a redeemable value of approximately $250 and the other by comparison having a de minimis present value. Counsel for Martin Investors now concedes that the award should be reduced by the redeemable value of the projectors retained. Accordingly, we order a remittitur of $250.

CCC and the individual defendants finally challenge the amounts awarded to Martin Investors for attorneys fees. They argue that attorneys fees are authorized only in a suit for damages under § 80C.17, subd. 3. We do not interpret that provision as limiting the recovery of attorneys fees to damage actions. Rather, it specifically permits a claim for costs and disbursements plus reasonable attorneys fees in "[a]ny suit authorized under this section," which plainly includes a suit for rescission and restitution. CCC and the individual defendants also argue that in any event only trial-related legal fees are authorized under § 80C.17, subd. 3, and the trial court therefore erred in allowing $5,300, which the parties stipulated was incurred by Martin Investors for pretrial legal expenses including the costs of incorporating its business and similar legal expenses of doing business. We find that the trial court properly allowed this sum, not as an award of attorneys fees, which would require specific statutory authorization, but rather as an expense of entering a business under the contract for which Martin Investors was entitled to restitution upon rescission of the contract. The trial court's award of $1,505 for trial-related legal expense was clearly proper within § 80C.17, subd. 3.

With the exception of the sum for which we permit a remittitur, we find that all of the amounts that the trial court ordered restored to Martin Investors represent reasonable and proper awards under § 80C.17.

Martin Investors' claim for attorneys fees on appeal is denied.

Affirmed and remittitur ordered.

SHERAN, C. J., took no part in the consideration or decision of this case.

damages sustained by the plaintiff together with costs and disbursements plus reasonable attorney's fees.

"Subd. 4. Except as explicitly provided in this section, no civil liability in favor of any private party shall arise against any person by implication from or as a result of the violation of any provision of sections 80C.01 to 80C.22 or any rule or order thereunder. Nothing herein shall limit any liability which may exist by virtue of any other statute or under common law if sections 80C.01 to 80C.22 were not in effect."