STATE OF MINNESOTA

IN SUPREME COURT

A22-0723
A22-0724

Court of Appeals                                                      Procaccini, J.
                                              Took no part, Hennesy, Gaïtas, JJ.

Cambria Company, LLC,

                Respondent,

vs.                                                          Filed:  September 11, 2024
                                                             Office of Appellate Courts

M&M Creative Laminants, Inc.
dba M&M Creative Laminates, Inc.,

                Defendant (A22-0723),
                Appellant (A22-0724),

Leland P. Schermer,

                Appellant (A22-0723).

_____

Bryan R. Freeman, James J. Long, Jevon C. Bindman, Maslon LLP, Minneapolis, Minnesota, for respondent.

Matthew D. Swanson, Greenstein Sellers PLLC, Minneapolis, Minnesota; and

Leland P. Schermer, Marcus & Shapira LLP, Pittsburgh, Pennsylvania, for appellant M&M Creative Laminates, Inc.

_____

1.      The Minnesota Franchise Act, Minnesota Statutes sections 80C.01–.22 (2022), does not categorically preclude an out-of-state company from enforcing a claim for unfair practices under section 80C.14.

2.      Payments for finished quartz products at a bona fide wholesale price, with payment for fabrication services included in that price, do not constitute a "franchise fee" as defined under section 80C.01, subdivision 9, of the Minnesota Franchise Act.

Affirmed.

O P I N I O N

PROCACCINI, Justice.

This case arises out of a business dispute between appellant M&M Creative Laminants, Inc., dba M&M Creative Laminates, Inc. (M&M), and respondent Cambria Company, LLC (Cambria).  After terminating its business relationship with M&M, Cambria sued M&M for payment of unpaid invoices.  M&M asserted a counterclaim against Cambria under the Minnesota Franchise Act (the Act), Minnesota Statutes section 80C.01–.22 (2022), arguing that Cambria violated section 80C.14, subdivision 3, governing unfair termination practices.  The district court granted summary judgment for Cambria on the counterclaim, determining that M&M did not pay Cambria a franchise fee—a requirement to qualify as a franchise under section 80C.01, subdivision 4(a)(1)— and therefore the parties' relationship was not covered by the Act.  The court of appeals affirmed the grant of summary judgment, agreeing that M&M did not pay Cambria a franchise fee, and alternatively concluding that M&M is precluded from bringing a claim

2

under section 80C.14 because M&M is an out-of-state company. Although we conclude that the Act does not categorically preclude an out-of-state company from enforcing section 80C.14, we agree that the parties' relationship was not a franchise under the Act because M&M did not pay Cambria a franchise fee. Accordingly, we affirm.

**FACTS**

Cambria is a Minnesota company that manufactures and sells its own brand of quartz surface products. Cambria manufactures raw quartz material into slabs. The quartz slabs must then be fabricated—cut and shaped—to the specific geometric dimension for the designated end use. Common end uses for Cambria's finished quartz products include countertops, islands, backsplashes, and tile in various residential and commercial spaces.

M&M is a Pennsylvania company that primarily sells custom countertops and cabinetry to homeowners and kitchen and bath dealers. In 2008, Cambria sent one of its employees to Pennsylvania to approach M&M about entering a business relationship. At that time, Cambria sold both unfabricated quartz slabs and fabricated quartz products. Cambria sold unfabricated quartz slabs to certain business partners referred to as "fabricator associates," and it sold fabricated quartz products to others, called "installer associates." Generally, Cambria decided whether a business partner would be a fabricator associate or an installer associate based on the partner's proximity to one of Cambria's fabrication shops. Prospective business partners operating within a workable distance from one of Cambria's fabrication shops were typically selected as installer associates. Because Cambria had recently opened a fabrication shop near Cleveland, Ohio—about 100 miles from M&M's office in Pittsburgh—Cambria offered to make M&M an installer associate.

3

M&M accepted Cambria's offer, and in May 2009, the parties signed business-partner agreements drafted by Cambria. The agreements included a variety of documents and provisions but did not include a provision governing duration or termination. The agreements also did not require M&M to pay Cambria an upfront fee for the right to enter the business relationship, nor did they contain an ongoing royalty charge.

The business partnership generally operated as follows: (1) M&M received an order from one of its customers, (2) M&M provided Cambria with detailed measurements and computer drawings of the product that its customer ordered and submitted a purchase order, (3) Cambria fabricated the quartz slabs at its Cleveland-area fabrication shop per M&M's specifications, (4) the finished quartz product was delivered from the fabrication shop to M&M's place of business, and (5) M&M installed the finished quartz product at its customer's designated location.

As an installer associate, M&M was not permitted to purchase unfabricated quartz slabs from Cambria; it could purchase only finished quartz product fabricated per its customers' specifications. According to Cambria's chief financial officer, Cambria generally charged M&M and other installer associates approximately $55 per square foot on average for the combination of quartz material and fabrication services. Cambria's chief financial officer estimated that $22 of this price was attributable to the material alone and that $33 was attributable to fabrication. M&M's owner testified that M&M generally resold the finished countertops to its customers at around a 100 percent markup.

The parties' relationship lasted for approximately eight years. In May 2017, Cambria sent representatives to M&M's office to notify M&M that Cambria was

4

terminating the business relationship and would no longer sell its products to M&M. Cambria claimed that M&M owed over $180,000 for countertops that had already been delivered.

Cambria brought this lawsuit against M&M to recover the amount M&M owed on various unpaid invoices. M&M asserted several counterclaims, including a counterclaim for unlawful termination of the parties' alleged franchise agreement under the Act. Section 80C.14, subdivision 3, of the Act requires, among other things, good cause for terminating a franchise and a 90-day advance notice of reasons for termination. We focus exclusively on this counterclaim, which is the sole issue before us.

Cambria moved for summary judgment on M&M's counterclaim, arguing that the parties' relationship was not a "franchise" under the Act because M&M did not pay Cambria a franchise fee as the statutory definition of "franchise" requires. Alternatively, Cambria argued that M&M was not entitled to sue for damages under the Act because M&M is an out-of-state company. The district court granted Cambria's motion for summary judgment on M&M's counterclaim, determining that M&M did not pay Cambria a franchise fee. In making this determination, the district court noted that a purchase of goods at a bona fide wholesale price is explicitly excluded from the definition of a "franchise fee" under the Act. *See* Minn. Stat. § 80C.01, subd. 9. The district court reasoned that the required fabrication services included in each transaction did not constitute a separate payment for services or transform the purchase of finished goods into a purchase of services because, "[w]hen reviewing the role of services for custom products, 'services are always required to convert raw materials into a useful product. That some

5

added service is [required] . . . does not transform a contract of sale into a contract for services.' " (Quoting *Valley Farmers' Elevator v. Lindsay Bros. Co.*, 398 N.W.2d 553, 556 (Minn. 1987), *overruled on other grounds by Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn. 1990)). Accordingly, the district court concluded that M&M did not pay Cambria a franchise fee[1] and therefore could not enforce a claim against Cambria under the Act. The district court did not address Cambria's alternative argument that the Act applies only to Minnesota-based companies. M&M appealed.

The court of appeals concluded that the summary judgment record supported the district court's determination that M&M paid Cambria a bona fide wholesale price for the finished quartz products. *Cambria Co. v. M&M Creative Laminants, Inc.*, 995 N.W.2d 426, 436 (Minn. App. 2023). The court acknowledged that the parties' business arrangement required M&M to buy fabrication services when it placed purchase orders with Cambria, but it "agree[d] with the district court that the 'dominant characteristic' of the [agreements] was for Cambria to sell M&M finished countertops." *Id.* at 437 (quoting *Vermillion State Bank v. Tennis Sanitation, LLC*, 969 N.W.2d 610, 620 (Minn. 2022)). The

---

[1] M&M also claimed that a variety of other expenses—including payments for software and equipment, travel to Minnesota, and advertising and marketing—qualified as franchise fees. M&M submitted an affidavit by one of its experts addressing these alleged franchise fees. The district court determined that these expenses were ordinary business expenses and were not franchise fees, and the court then struck the expert affidavit. M&M did not address these alleged franchise fees or the expert affidavit in its petition for review. Accordingly, we need not review the district court's decision to strike the affidavit or decide whether any of these other expenses were franchise fees. *See State v. Hunn*, 911 N.W.2d 816, 821 (Minn. 2018) (holding that defendant forfeited issue because it was not raised in his petition for review).

court of appeals therefore concluded that M&M did not pay Cambria a franchise fee. *Id.* at 437–38.

Although the district court did not rule on the issue, the court of appeals alternatively concluded that M&M is precluded from asserting the counterclaim because M&M does not operate within Minnesota. *Id.* at 438 n.4. The court of appeals relied on our statement in *Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 872 (Minn. 1978), that the Act " 'was adopted in 1973 as remedial legislation designed to protect potential franchisees *within* Minnesota from unfair contracts and other prevalent and previously unregulated abuses in a growing national franchise industry.' " *Cambria Co.*, 995 N.W.2d at 438 n.4.

For the above reasons, the court of appeals affirmed the grant of summary judgment for Cambria. We granted M&M's petition for further review.[2]

## ANALYSIS

This appeal presents two questions: (1) whether M&M is precluded from bringing a claim under section 80C.14 of the Act against Cambria, a Minnesota company, simply because M&M is an out-of-state company, and (2) whether M&M and Cambria's business relationship was a franchise under the Act. Both questions present issues of statutory interpretation, which we review do novo. *In re Krogstad*, 958 N.W.2d 331, 334 (Minn. 2021). This appeal also comes to us on review of "the district court's grant of summary judgment, which we likewise review de novo." *Schneider v. Children's Health*

---

[2] Following oral argument, M&M filed a letter citing supplemental authority. *See* Minn. R. Civ. App. P. 128.05. Cambria moved to strike the letter. Because the supplemental authority provided to us was not ultimately relevant to the disposition of this appeal, Cambria's motion to strike is denied.

*Care*, 996 N.W.2d 197, 201 (Minn. 2023). "Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.*; *see also* Minn. R. Civ. P. 56.01. On appeal from a grant of summary judgment, we review the evidence in the light most favorable to the party against whom summary judgment was granted—in this case, M&M. *Windcliff Ass'n, Inc. v. Breyfogle*, 988 N.W.2d 911, 916 (Minn. 2023).

I.

We first consider whether M&M is precluded from bringing its counterclaim under section 80C.14 of the Act because it is not a Minnesota company. When interpreting statutes, our objective is to "ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2022). And when the statutory text is clear and unambiguous, we give effect to the plain language. *Cocchiarella v. Driggs*, 884 N.W.2d 621, 624 (Minn. 2016).

M&M bases its counterclaim on Cambria's alleged violation of Minnesota Statutes section 80C.14, subdivision 3. Under that provision, "[n]o person may terminate or cancel a franchise unless . . . that person has given written notice setting forth all the reasons for the termination or cancellation at least 90 days in advance of termination or cancellation," and "[n]o person may terminate or cancel a franchise except for good cause." Minn. Stat. § 80C.14, subd. 3(a), (b). A party who violates "any provision of [the Act] shall be liable to the franchisee or subfranchisor who may sue for damages caused thereby . . . ." Minn. Stat. § 80C.17, subd. 1.

We find little support for the contention that these provisions were meant to be enforceable only by franchisees within Minnesota. The plain language of section 80C.14

8

does not indicate that the Legislature intended such a limitation. Nor does section 80C.17, subdivision 1, suggest that violators of the Act's provisions are liable only to franchisees within Minnesota. Further, the Act does not limit its definition of the term "franchisee" to –include only Minnesota companies. *See* Minn. Stat. § 80C.01, subd. 5 (defining "franchisee").

The Legislature *did* include express territorial limitations in other provisions contained within the Act. For example, section 80C.03(h) provides that the registration requirement imposed by section 80C.02 does not apply to "the offer or sale of a franchise to a resident of a foreign state, territory, or country who is neither domiciled in this state nor actually present in this state, if the franchise business is not to be operated wholly or partly in this state" unless the sale violates the law of the foreign state, territory, or county concerned. Minn. Stat. § 80C.03(h). And section 80C.19 provides that the provisions of the Act "concerning sales and offers to sell shall apply when a sale or offer to sell is made in this state; when an offer to purchase is made and accepted in this state; or when the franchise is to be located in this state." Minn. Stat. § 80C.19, subd. 1.[3] "When the Legislature uses limiting or modifying language in one part of a statute, but omits it in another, we regard that omission as intentional and will not add those same words of limitation or modification to parts of the statute where they were not used." *Gen. Mills, Inc. v. Comm'r of Rev.*, 931 N.W.2d 791, 800 (Minn. 2019). Accordingly, if the

---

[3] Neither party argued in its briefing to our court that the jurisdictional requirements provided in section 80C.19 are applicable to the provisions of section 80C.14. That issue is not before us, and we need not reach it to resolve the dispute in this case.

Legislature had intended section 80C.14 to apply only to Minnesota-based franchisees, it could have said so, as it did in sections 80C.03(h)[4] and 80C.19. *See Depositors Ins. Co. v. Dollansky*, 919 N.W.2d 684, 688 (Minn. 2018) (rejecting appellant's argument that the Legislature intended the definition of "insured" under the statute at issue to apply only to *named* insureds because "[t]he Legislature could have used the phrase 'named insured' if it intended to do so").

To support its assertion that the remedies provided under section 80C.14 apply only to Minnesota franchisees, Cambria relies on a statement from our court about the Act's purpose. In *Martin Investors*, we stated that the Act "was adopted in 1973 as remedial legislation designed to protect potential franchisees *within Minnesota* from unfair contracts and other prevalent and previously unregulated abuses in a growing national franchise industry." 269 N.W.2d at 872 (emphasis added); *see also Clapp v. Peterson*, 327 N.W.2d 585, 586 (Minn. 1982) (citing *Martin Investors*). But our statement in *Martin Investors* is not dispositive for two reasons. First, because the franchisee in *Martin Investors* was a Minnesota company, we did not address or analyze the Act's territorial scope, and the statement was therefore dicta.[5] Second, stating that the Act is intended to protect

---

[4]     When the Act was passed in 1973, section 80C.03 did not include an express territorial exemption regarding the registration requirement in section 80C.02. That territorial limitation language was added to section 80C.03 in 1981. Act of May 11, 1981, ch. 165, § 4, 1981 Minn. Laws 492, 495 (codified as amended at Minn. Stat. § 80C.03(h) (2022)).

[5]     "Dicta, or more properly 'obiter dicta,' generally is considered to be expressions in a court's opinion which go beyond the facts before the court and therefore are the individual views of the author of the opinion and not binding in subsequent cases." *State ex rel. Foster v. Naftalin*, 74 N.W.2d 249, 266 (Minn. 1956).

Minnesota franchisees is not the same as stating that the Act is intended to protect *only* Minnesota franchisees.

Cambria also emphasizes that other states' franchise laws limit "relationship" provisions similar to section 80C.14 to in-state franchisees. *See, e.g.*, Ark. Code Ann. § 4-72-203(a)(1) (2023) (act applicable if performance of franchise "contemplates or requires the franchise to establish or maintain a place of business within" Arkansas); Cal. Bus. & Prof. Code § 20015 (2023) (act applicable if franchisee is "domiciled in" California or if "the franchised business is or has been operated in this state"); Iowa Code § 537A.10 (2023) (act applies to a franchise "that is operated in this state" which means that "the premises from which the franchise is operated are physically located in this state"). But the Minnesota Legislature did not similarly limit the Act's territorial scope, and "we will not add requirements to the statute beyond those specified by the legislature." *Hutchinson Tech., Inc., v. Comm'r of Rev.*, 698 N.W.2d 1, 8 (Minn. 2005).

Accordingly, we conclude that the Act does not categorically preclude an out-of-state company from enforcing a claim for unfair practices under section 80C.14. We do not, however, suggest that section 80C.14 is enforceable by *every* out-of-state company. Of course, an out-of-state company must show that section 80C.14 is otherwise applicable, and companies without a connection to Minnesota may face jurisdictional or other hurdles. But here, M&M engaged in continuous business with Cambria—a Minnesota company—for eight years. The parties' business agreements were drafted in Minnesota, and M&M sent personnel to Minnesota for training and certifications. And the parties' contract, drafted by Cambria, includes a Minnesota choice-of-law provision.

11

Under these circumstances, the fact that M&M is an out-of-state company does not preclude it from bringing a claim under the Act.

II.

The remaining issue is whether Cambria and M&M's business relationship constituted a "franchise" under the Act. Under the Act, a business relationship is a "franchise" if (1) the parties had an agreement by which the franchisee has the right to sell the goods or services of the franchisor using the franchisor's name or trademark; (2) the franchisor and franchisee had "a community of interest" in marketing the goods or services, and (3) the franchisee paid, "directly or indirectly," a "franchise fee." *Current Tech. Concepts, Inc. v. Irie Enters. Inc.*, 530 N.W.2d 539, 542 (Minn. 1995); Minn. Stat. § 80C.01, subd. 4(a)(1).[6]

The parties' dispute centers on the third element—whether M&M paid Cambria a "franchise fee."[7] The Act defines a franchise fee as:

> [A]ny fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, *any payment for goods or services*, or any training fees or training school fees or charges; provided, however, that the following *shall not* be considered the payment of a franchise fee:

---

[6] The Act defines four types of franchises. *See* Minn. Stat. § 80C.01, subd. 4(a)(1)–(4). The parties agree that the type of franchise defined in section 80C.01, subdivision 4(a)(1), is at issue in this case.

[7] For purposes of its summary judgment motion, Cambria assumed that the first two elements of a "franchise" under section 80C.01, subdivision 4(a)(1), were met.

> (a) *the purchase of goods or agreement to purchase goods at a bona fide wholesale price . . . .*

Minn. Stat. § 80C.01, subd. 9 (emphasis added).

M&M defines its transactions with Cambria as (1) the sale and purchase of unfabricated quartz material at a bona fide wholesale price, *plus* (2) the sale and purchase of fabrication services. M&M accordingly argues that the payments for fabrication services were a required "payment for . . . services" constituting a franchise fee under the Act. Cambria defines the transactions differently, characterizing its transactions with M&M as the sale and purchase of a fabricated quartz product at a bona fide wholesale price. Cambria argues that M&M's payments are expressly exempt from the definition of a franchise fee under the "wholesale-goods exception."

The district court and the court of appeals resolved the parties' disagreement by analogizing to case law interpreting and applying Article 2 of the Uniform Commercial Code, which governs the buying and selling of goods. *Cambria Co.*, 995 N.W.2d at 436–37; *see* Minn. Stat. § 336.2-102 (2022) (stating that Article 2 "applies to transactions in goods"). We do not find it necessary to undertake that analysis, however, because the statutory language of the Act and the summary judgment record resolve the issue.

We begin with the statutory language. The Act states that "any payment for goods or services" that "a franchisee . . . is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement" is a franchise fee. Minn. Stat. § 80C.01, subd. 9. But the Act includes an exception, stating that "the purchase

13

of goods or agreement to purchase goods at a bona fide wholesale price" is *not* a franchise fee. *Id.*, subd. 9(a).

The Act does not expressly define "wholesale price." In interpreting a statute, we generally read words according to their common meaning, but " 'technical words and phrases . . . are construed according to [their] special meaning or their definition.' " *Staab v. Diocese of St. Cloud*, 813 N.W.2d 68, 72 (Minn. 2012) (alteration in original) (quoting Minn. Stat. § 645.08(1) (2010)). *Black's Law Dictionary* defines "wholesale price" as "[t]he price that a retailer pays for goods purchased ([usually] in bulk) from a wholesaler for resale to consumers at a higher price." *Wholesale Price*, *Black's Law Dictionary* (12th ed. 2024).

The summary judgment record, viewed in the light most favorable to M&M, demonstrates that M&M purchased *fabricated quartz products* from Cambria at a bona fide wholesale price. In other words, M&M did not purchase unfabricated quartz material from Cambria and then separately contract and pay Cambria for fabrication services. And it is undisputed that, after purchasing the finished quartz product from Cambria, M&M typically resold the product at around a 100 percent markup, which demonstrates that the products were sold to M&M at a wholesale price.

M&M emphasizes that certain fabrication services, specifically "cut-outs," were listed as a separate line item on the parties' invoices. M&M argues that these cut-outs were therefore fabrication services that it was required to purchase independently from the finished quartz product. These cut-outs, however, were included in the final purchase price of the finished quartz product. Payments for manufacturing services *included* in the

14

purchase of goods at a bona fide wholesale price are exempted from the definition of "franchise fee." *Cf. Valley Farmers' Elevator*, 398 N.W.2d at 556 ("Services are always required to convert raw materials into a useful product."). To conclude otherwise would suggest that any charge for services included in the price of a manufactured good is a franchise fee.

M&M also argues that the wholesale-goods exception applies *only* to goods, and any service fee that is part of a transaction for a finished good is not exempted. M&M relies on our statement in *Martin Investors* that the wholesale-goods exception "exempts wholesale purchases of goods, not services such as those marketed by [the franchisor]." 269 N.W.2d at 875 n.8. But in *Martin Investors*, the franchisor sold computer *services*; there were no goods involved in its transactions with its franchisee. *Id.* at 870. Accordingly, we dismissed the franchisor's argument that the wholesale-goods exception applied to a transaction *solely* involving services. *Id.* at 875 n.8. But the transaction here involved a purchase of finished *goods*. Although manufacturing services like fabrication were necessary to transform the raw quartz materials to finished quartz products, it is undisputed that M&M contracted with Cambria to purchase fabricated quartz products at a wholesale price, and that is what M&M received from Cambria.

We must address a final question before concluding our analysis. As the court of appeals has recognized for decades, a purchase of goods at a wholesale price may include a "hidden" franchise fee if the franchisee was required to purchase amounts or items that it would not have purchased otherwise, or if the price paid exceeded a wholesale price. *OT Indus., Inc. v. OT-tehdas Oy Santasalo-Sohlberg Ab*, 346 N.W.2d 162, 166

15

(Minn. App. 1984); *see also Upper Midwest Sales Co. v. Ecolab, Inc.*, 577 N.W.2d 236, 242 (Minn. App. 1998) (concluding minimum purchase requirements are not indirect franchise fees because they were "not unreasonable, at prices above wholesale, or in amounts greater than the distributors would have purchased otherwise"). We agree that a franchise fee might be "hidden" in this way, but the indicia of such a fee are not present here. Although the parties' business agreement did not allow M&M to purchase unfabricated quartz material from Cambria, M&M was not required to purchase amounts or items that it otherwise would not have. And, even when we view the record in the light most favorable to M&M, the record does not show that Cambria sold its finished quartz product to M&M at prices exceeding bona fide wholesale prices.

Because M&M's payments to Cambria for fabricated quartz product were payments for goods at a bona fide wholesale price—and did not include a "hidden" franchise fee—we conclude that the record does not show that M&M paid a franchise fee to Cambria. For that reason, the parties' relationship was not a franchise under the Act. Accordingly, the district court did not err in granting summary judgment for Cambria on M&M's counterclaim under the Act.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

HENNESY and GAÏTAS, JJ., not having been members of this court at the time of submission, took no part in the consideration or decision of this case.