**AMERICAN PARTS SYSTEM, INC., Respondent,**

v.

**T & T AUTOMOTIVE, INC., et al., Appellants.**

**T & T AUTOMOTIVE, INC., third-party plaintiff, Appellants,**

v.

**A.P.S., INC., et al., third-party defendants, Respondents.**

No. C3–84–82.

Court of Appeals of Minnesota.

Nov. 27, 1984.

Mark G. Ohnstad, Mark E. Lasee, Thomsen, Nybeck, Johnson, Bouquet & Van Valkenburg, Edina, for respondent.

Richard W. Davis, Altman, Weiss & Bearmon, St. Paul, for appellants.

Heard, considered and decided by WOZNIAK, P.J., and FORSBERG and LESLIE, JJ.

## OPINION

FORSBERG, Judge.

This is an appeal from a judgment entered for American Parts for sums owing to it by T & T Automotive [hereafter, T & T], both on open account for purchase of supplies and on a secured loan. T & T defended claiming that its agreement with American Parts constituted a franchise under Minnesota law, Minn.Stat. § 80C.01, and that American Parts was prevented from recovering by its failure to register that agreement, and to make the disclosures required by the franchise law. Finally, T & T claimed that American Parts' repossession and retention of the inventory without written notice was a retention in full satisfaction of the obligation, precluding the personal judgment. The trial court rejected these arguments. We affirm.

## FACTS

American Parts System, Inc. [hereafter American Parts] is a distributor of auto parts, licensed and sold under the "Big A" logo.

T & T Automotive is a corporation formed by Thomas Vollbrecht, a former automobile dealership parts manager, and Richard Newman, a businessman with experience in other areas, to purchase and operate a Big A auto parts "jobber" in West St. Paul. T & T bought the store, which had been doing business for a number of years, in April, 1979, from Fred McGilvrey. The purchase was financed, in part, by means of an $80,000 loan from Autoparts Finance Co. [hereafter AFCo], a sister company engaged in financing Big A jobbers, and a fellow subsidiary of Gulf & Western. Both Vollbrecht and Newman invested in T & T. Vollbrecht also managed the store; Newman was a passive investor.

T & T signed a number of agreements with American Parts and with AFCo, including a Pledge Agreement in connection with the AFCo loan, and a Trademark Agreement with American Parts. The Pledge Agreement included the following provision:

> The Corporation shall maintain, as a part of its inventory, brands of merchandise stocked by the supplier(s) as set forth in Exhibit G hereto in an amount not less than the ongoing outstanding loan balance.

Exhibit G referenced the Big A Distribution Center in Minneapolis.

The Trademark Agreement provided, in part, as follows:

> Jobber understands that the public recognizes the Big A sign and expects a standard of uniformity and quality in product and service. Therefore, to meet public expectations, *Jobber agrees that he shall carry a representative supply of [Big A] products* and shall conduct his business in such a manner as to protect the goodwill and image of APS.

[Emphasis added].

Although T & T bought the store inventory from McGilvrey, it purchased in re-

sponse to an ad from American Parts, which showed Vollbrecht the location, sent him a written brochure describing the services provided to Big A jobbers and allegedly made oral representations. T & T claimed at trial that American Parts failed to live up to these representations, and the business failed as a result. The trial court found no fraud on the part of American Parts, and determined that the business' failure was due to the mismanagement of T & T.

The store discontinued business on October 6, 1980. T & T had stopped making payments on the AFCo loan and had fallen behind on its open account with American Parts, which took possession of T & T's inventory on the premises, and attempted to find a new jobber to take over the store, without success. American Parts removed the inventory to its Minneapolis distribution center in January, 1981, for resale at the jobber price.

American Parts claimed that possession was by mutual agreement. T & T denies any mutual agreement, and claims that the only notice given was a telephone call to T & T's accountant. American Parts credited T & T's account with the current jobber price for the inventory, minus a restocking charge.

## ISSUES

1. Did T & T's agreement with American Parts constitute a franchise under Minnesota law?

2. Did the repossession and resale of the inventory of T & T without written notice constitute a satisfaction of T & T's obligation?

## ANALYSIS

*1. "Franchise" agreement*

▮ Minn.Stat. § 80C.01 subd. 4 (1982), defines a "franchise" in terms of three requirements:

1) A right granted to the franchisee to engage in business using the franchiser's trade name or other commercial symbol,

2) a "community of interest" in the marketing of goods or services between the franchisee and franchiser, and

3) a "franchise fee" paid by the franchisee.

*Martin Investors, Inc. v. Vander Bie,* 269 N.W.2d 868, 874 (Minn.1978). All three elements are required in order to find a franchise. *Id.* Only the last requirement is at issue here.

▮ A "franchise fee" is defined as follows:

"Franchise fee" means any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for goods or services, or any training fees or training school fees or charges; provided, however, that the following shall not be considered the payment of a franchise fee:

(a) The purchase of goods or agreement to purchase goods at a bona fide wholesale price * * *.

Minn.Stat. § 80C.01, subd. 9 (1982).

This court, in *OT Industries, Inc. v. OTtehdas Oy Santasalo-Sohlberg Ab,* 346 N.W.2d 162 (Minn.Ct.App.1984), held that the required purchase of goods may constitute a "franchise fee," even though bought at bona fide wholesale prices, if there is a minimum volume requirement that does not correspond to the reasonable requirements of the business. In *OT Industries,* the minimum purchase requirement of 3,000 products per year was held not to constitute a "franchise fee" because the distributor had four years' experience to gauge its own requirements, and because failure to meet the minimum resulted only in renegotiation of the contract, not termination.

■ Here there is a question whether there was a minimum volume requirement exceeding the reasonable needs of the business. The Trademark Agreement's requirement that T & T maintain a "representative supply" was only to meet the expectations of customers that Big A products would be stocked. Although an obvious minimum of inventory was intended, T & T had as much interest as American Parts in satisfying its customers' product expectations. The amount of inventory required was certainly within the reasonable requirements of the business.

The Pledge Agreement required that T & T maintain an inventory at least equal to the amount of the loan ($80,000). While it is true that T & T was not required to purchase the collateral directly from American Parts, as a practical matter the majority of its inventory had to be Big A products, which it could purchase only from American Parts.

T & T bought a large percentage of the inventory necessary to meet the Pledge Agreement requirement in the course of buying out the previous owner, McGilvrey. In the beginning, therefore, the collateral requirement did not constitute a minimum volume requirement as was presented in *OT Industries,* where a purchase from the manufacturer was required.

With the turnover of the inventory purchased from McGilvrey, however, T & T was required to restock to maintain an inventory of about $80,000. If this was an unreasonable amount for the store, it could constitute an indirect franchise fee. However, the estimated requirement for the business when T & T bought it was a $75,000 inventory. This was an American Parts estimate, which may have been influenced by the loan amount. However, Vollbrecht himself testified that the inventory in the store when T & T bought the business was $84,000. The previous owner was not asked what his normal inventory was. In general, the testimony did not show that the inventory required by the Pledge Agreement was unreasonable; therefore, it was not a franchise fee. *OT Industries.*

*2. Repossession and resale of collateral*

■ After T & T's discontinuance of the business, American Parts, in January of 1981, removed the inventory from the store for resale from its distribution center and credited T & T's account for the entire stock, at the jobber price less a restocking charge. American Parts claims its action was in accord with its rights under Minn. Stat. § 336.9–504 (1982). T & T argues that the retention of the inventory constituted an acceptance of the collateral as a complete discharge of the obligation.

Minn.Stat. § 336.9–504 gives a creditor the basic right to sell the collateral, by either public or private sale, provided it is commercially reasonable. American Parts was not even required to notify T & T of the sale, since the collateral was "of a type customarily sold on a recognized market." Minn.Stat. § 336.9–504(3) (1982).

T & T's position, that the repossession of collateral necessary for its sale constitutes an acceptance of full discharge, would nullify a creditor's right of sale. Its claim that Minn.Stat. § 336.9–505 is applicable misreads that statute, which requires that a creditor has given notice to the debtor of its "propos[al] to retain the collateral in satisfaction of the obligation." Minn.Stat. § 336.9–505(2) (1982). No such notice was given here.

**DECISION**

Neither the requirement that T & T maintain a representative supply of Big A parts, nor the requirement that it maintain inventory in the amount of its loan balance constituted a franchise fee. Thus, the agreement was not a franchise agreement required to be registered under Minnesota law. Repossession of the inventory for resale was not a discharge of T & T's obligation.

Affirmed.