**UPPER MIDWEST SALES CO., et al., Respondents,**

v.

**ECOLAB, INC., a Delaware corporation, Appellant.**

No. CX–97–1763.

Court of Appeals of Minnesota.

April 14, 1998.

J. Michael Dady, Robert A. Gust, Dady & Garner, P.A., Minneapolis, for respondent Upper Midwest Sales.

Rosyln T. Mandel, Messerli & Kramer, P.A., Minneapolis, for respondent Biokem.

Richard L. Gill, Thomas B. Hatch, Julie L. Levi, Robins, Kaplan, Miller & Ciresi, LLP, Minneapolis, for appellant.

Considered and decided by AMUNDSON, P.J., and SHORT and FOLEY *, JJ.

## OPINION

DANIEL F. FOLEY, Judge.

Respondents brought suit against appellant for contractual and statutory violations in their manufacturer/distributor relationship. The district court granted a temporary injunction compelling a continuation of the relationship. Appellant challenges the district court's refusal to vacate the temporary injunction. We reverse.

## FACTS

Appellant Ecolab, Inc. is a Delaware corporation with its principal place of business in Minnesota. Appellant's business includes a janitorial division that develops and distributes cleaning products under the brand name Airkem. Appellant acquired the Professional Products division of Airwick Industries, Inc. (Airwick) in 1986. Airwick originally was

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

named Airkem Corporation, and the brand name Airkem has continued to be associated with the Professional Products division.

When appellant acquired Airwick, it also acquired Airwick's network of 70 to 80 distributors. The distributors had written agreements for a period of years, which gave them the exclusive right to sell Airkem products in a particular territory. In exchange for their territorial exclusivity, the distributors agreed to sell only Airkem products. The agreements also required that the distributors satisfy certain minimum purchase commitments (MPCs) during each six-month period.

At the time of appellant's acquisition, Airkem had inefficient manufacturing processes, product quality problems, and outdated marketing materials. In 1988, appellant decided that eliminating the exclusivity provision in the distributor agreements would help to grow its business. Negotiations were held between Airkem distributors and appellant. Nearly all of the distributors, including four of the five respondents in this action, entered into amended distributor agreements.

The amended agreements eliminated the exclusivity provisions of the prior agreements and provided for a term of seven years, ending December 31, 1995. As consideration for the new agreements, respondents gave up their territorial exclusivity. In exchange, appellant agreed to the relinquishment of product exclusivity, elimination of MPCs, access to Eco–Line products, access to Micro–Pro technology, access to new products, access to a custom label program, continuation of 45–day credit terms until December 31, 1990, five percent base payments, and two percent growth payments. The amended agreements also stated that Minnesota law would apply to disputes, rather than New Jersey law, which had been chosen in prior agreements.

The only distributor choosing not to convert was Airkem Professional Products of Fairfield County (APP). Because APP did not sign a new agreement, New Jersey law continued to govern its relationship with appellant. Also, APP still had to meet MPC requirements. In 1993, appellant notified APP that APP had breached the distributor agreement in several ways, and that it would be converted to nonexclusive status if it failed to meet certain conditions. The parties did not sign any written contract after that, but did continue doing business.

In November 1995, appellant informed the distributors that it intended to renew the distributor agreements with each of them. A dispute arose as to how the negotiations for new agreements would take place. On November 28, 1995, counsel for six original plaintiffs obtained a temporary restraining order prohibiting appellant from terminating the agreements with them. That same day, the plaintiffs moved for a temporary injunction. On November 29, 1995, the six original plaintiffs served their complaint on appellant. The amended complaint alleges sixteen claims, including (1) tortious interference with existing and prospective contractual relationships, (2) breach of contract, (3) breach of implied covenant of good faith and fair dealing, (4) promissory and equitable estoppel and waiver, (5) violation of various Sales Representative Acts, (6) fraud, (7) negligent misrepresentation, (8) breach of franchise agreements, (9) breach of various state Business Opportunity Acts, (10) unjust enrichment, (11) recoupment, (12) breach of the Wisconsin Fair Dealership Law, (13) violation of various Deceptive and Unfair Trade Practices Acts, (14) violation of the Consumer Fraud Act, (15) price fixing, and (16) monopolization. Of the six original plaintiffs, Upper Midwest Sales Co. (Upper Midwest), Cleancare, Inc. (Cleancare), and Metro Professional Products, Inc. (Metro) are respondents in this appeal.

On December 12, 1995, the district court granted appellant's motion to dissolve the temporary restraining order.

On January 26, 1996, an evidentiary hearing was held, and on March 19, 1995, the district court granted a temporary injunction. The court based the injunction on the fragile relationship of the parties, the possibility of success on the merits, and the potential harm to the plaintiffs. The injunction required the parties to continue their nonexclusive distributor relationships under the terms of the most recent agreements, which had expired on December 31, 1995.

On April 12, 1996, five distributors, including respondents APP and All Professional Products, Inc. (Allpro), moved to intervene as additional plaintiffs. They also moved for temporary injunctions. At the same time, appellant brought a motion to vacate the temporary injunction as to the original plaintiffs. The district court granted the new plaintiffs' motion to intervene and granted the temporary injunctions. It denied appellant's motion to dissolve the injunction. The district court found that the plaintiffs were not likely to prevail on the merits, but that the possibility of "irreparable harm on balance entitles the plaintiffs to the protection of the court."

On April 16, 1997, the district court granted summary judgment in favor of appellant on fourteen of the sixteen claims.[1] The remaining claims are (1) four violations of the Minnesota Franchise Act and (2) breach of contract by failing to provide consideration. The district court also ruled that the case would be decided according to Minnesota law.

Each plaintiff's claims will be tried separately. The trial of plaintiff Parker Supply was held in May–June 1997. The jury found in favor of appellant on the Minnesota Franchise Act claim and found in favor of Parker Supply on the breach of contract claim. The jury awarded $29,000 in damages.

In July 1997, appellant brought another motion to dissolve the temporary injunction. The district court vacated the injunction as to Parker Supply because there remained no likelihood of success on the merits, and the injunction had imposed administrative burdens on the court. The court did not dissolve the injunction as to the other remaining plaintiffs. The district court found:

(1) that there has been no change in circumstances arising from the trial of *Parker Supply v. Ecolab* sufficient to outweigh the potential irreparable harm to the remaining plaintiffs if the temporary injunction is vacated; (2) that the potential irreparable harm to plaintiffs outweighs any harm to defendant of continuing the injunctive relief previously granted, in that

the only burden on defendant is the obligation to continue to treat plaintiffs the same as it does other distributors; and (3) that although significant issues on the merits remain, these issues do not constitute a change in circumstance sufficient to vacate the temporary injunction already in effect.

This appeal followed.

## ISSUE

Does the denial of the motion to vacate the temporary injunction constitute a clear abuse of discretion?

## ANALYSIS

 A decision on whether to grant a temporary injunction is left to the discretion of the district court and will not be disturbed on appeal absent a clear abuse of that discretion. *Carl Bolander & Sons v. City of Minneapolis,* 502 N.W.2d 203, 209 (Minn.1993). A district court's findings regarding entitlement to injunctive relief will not be set aside unless clearly erroneous. *LaValle v. Kulkay,* 277 N.W.2d 400, 402 (Minn.1979). We view the facts in favor of the party who prevailed below. *Cramond v. AFL–CIO,* 267 Minn. 229, 126 N.W.2d 252, 257 (1964).

 For a temporary injunction to be granted, the party seeking the injunction must show that any possible legal remedy is inadequate and an injunction is necessary to prevent great and irreparable injury. *Cherne Indus., Inc. v. Grounds & Assoc., Inc.,* 278 N.W.2d 81, 92 (Minn.1979). Appellate courts review temporary injunction decisions in light of five factors:

(1) The nature and background of the relationship between the parties preexisting the dispute giving rise to the request for relief.

(2) The harm to be suffered by plaintiff if the temporary restraint is denied as compared to that inflicted on defendant if the injunction issues pending trial.

(3) The likelihood that one party or the other will prevail on the merits when the fact situation is viewed in light of estab-

---

1. The trial judge, in removing the equitable claims, supplied a thorough and comprehensive memorandum, which has been of great assistance to this court.

lished precedents fixing the limits of equitable relief.

(4) The aspects of the fact situation, if any, which permit or require consideration of public policy expressed in the statutes, State and Federal.

(5) The administrative burdens involved in judicial supervision and enforcement of the temporary decree.

*Dahlberg Bros., Inc. v. Ford Motor Co.*, 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965) (footnotes omitted).

Respondents have two claims remaining, breach of contract and violations of the Minnesota Franchise Act. With respect to breach of contract, there is an adequate remedy at law, and injunctive relief would be inappropriate. Therefore, the injunction is based solely on the franchise act claims.

## I. Likelihood of Success on the Merits

 The primary factor for an analysis of an injunction based on the franchise act is the likelihood of success on the merits. *Pacific Equip. & Irrigation, Inc. v. Toro Co.*, 519 N.W.2d 911, 915 (Minn.App.1994) ("The applicability of the franchise act is important because if the franchise act applies, the analysis of the *Dahlberg* factors may change substantially."), *review denied* (Minn. Sept. 16, 1994). If the franchise act applies, irreparable injury is presumed, and a court likely would find that analysis of the *Dahlberg* factors compels the issuance of an injunction. Minn.Stat. § 80C.14, subd. 1 (1996); *Toro*, 519 N.W.2d at 917. If the franchise act does not apply, no public policy is at stake, and respondents will have an adequate remedy at law for their harm. *Id.* at 915–16.

> If there is a close factual dispute which could go either way at a trial on the merits, a court should be reluctant to issue a preliminary injunction.

*Id.* at 918.

The district court has recognized repeatedly that respondents are unlikely to prevail on the merits. At the January 26, 1996 hearing, the district court stated that "success on the merits [is] quite unlikely." In the original order granting the injunction, the court stated that

[a]lthough the likelihood of plaintiffs' success on the merits is far from assured, the Court has concluded that their pursuit of relief upon claims of equitable estoppel might very well succeed.

The claim of equitable estoppel has been dismissed from this suit. On July 20, 1996, the district court stated "I'm even less convinced * * * that the plaintiffs are going to be successful on the merits." In its latest order denying appellant's motion to quash the injunction, the district court stated that "significant issues on the merits remain."

For respondents to prevail under the franchise act, they must show (1) that they are franchisees, and (2) that appellant violated the franchise act. The establishment of a franchise requires payment of a "franchise fee." Minn.Stat. § 80C.01, subd. 4(a)(3) (1996). The parties dispute whether respondents paid franchise fees. Minnesota law defines "franchise fee" as

> any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for goods or services, or any training fees or training school fees or charges; provided, however, that the following shall not be considered the payment of a franchise fee:
>
> (a) The purchase of goods or agreement to purchase goods at a bona fide wholesale price.

Minn.Stat. § 80C.01, subd. 9 (1996).

 Respondents argue that prior agreements referring to them as franchisees show that they have a franchise relationship. Franchise status is acquired by meeting the statutory requirements, however, regardless of the labels used by the parties. Moreover, the district court has ruled that the amended distributor agreements are fully integrated contracts with no ambiguities:

> Here, the Court finds that the Amendment Agreement on its face is a complete ex-

pression of the contract between the parties. Furthermore, the Court has also concluded there are no ambiguities in the agreement.

These amended agreements, under which the injunction was issued, do not mention franchise status or any fee paid by the distributors to do business. In fact, in 1984, an Airkem vice president explained the reason that it no longer referred to the distributors as franchisees:

> Well, in the last few years the Federal Government and many states have particularized the definition of Franchise to the point where we no longer fit in. McDonald's, Burger King, Dunkin' Donuts, Holiday Inn—they're Franchisees. We're independent distributorships.

■ Respondents argue that each of them paid a direct franchise fee when they started their Airkem distributorships. Cleancare, APP, and Metro became Airkem distributors by buying Airwick branch offices in 1979 and 1980. Nothing in their written sales agreements evidences a payment for the right to operate as a franchise. The agreements specified that the purchase prices were for names of Airwick accounts, equipment and other tangible property, and accounts receivable. APP also paid $130,000 for a non-compete agreement. Payments for these assets do not constitute a franchise fee. Allpro began its Airkem business in 1947. Allpro's vice president, Donald Wingerson, testified that he bought his Airkem business from another independent distributor. He did not pay any fee to Airwick at that time and has not since paid a fee for the right to distribute Airkem products. Allpro was required to pay 10% of its smoke odor removal business to Airwick. That was a separate part of the business, however, and the payments do not constitute a fee for *Airkem* distribution. Upper Midwest became an Airkem distributor in 1946. The current president testified that he has no record of a franchise fee being paid at that time. The record is devoid of evidence of a direct franchise fee by any respondent.

■ Likewise, there is no evidence of an indirect franchise fee. Respondents argue that minimum sales requirements constitute indirect franchise fees. The distributor agreements, prior to the 1988 amendments, stated:

> The Distributor shall purchase at least the dollar volume of Products designated in the Minimum Purchase Commitments in Schedule A attached hereto for each of the respective Six Months' Periods designated in such Schedule.

These minimum purchase commitments (MPCs) were paid to appellant by each of the distributors until 1988, when the amended agreements came into effect. The MPCs were discontinued in the amended agreements. APP did not sign an amended agreement, and its MPC obligation continued until 1993.

MPCs can constitute an indirect franchise fee if the prices exceeded bona fide wholesale prices or if the distributors were required to purchase amounts or items that they would not purchase otherwise. Minn.Stat. § 80C.01, subd. 9(a); *OT Indus., Inc. v. OT-tehdas Oy Santasalo–Sohlberg Ab,* 346 N.W.2d 162, 166 (Minn.App.1984). In applying that standard, we consider whether the requirements were unreasonable. *American Parts System, Inc. v. T & T Automotive, Inc.,* 358 N.W.2d 674, 677 (Minn.App.1984).

There is no evidence that the MPCs were not at the ordinary, wholesale price or that the distributors were required to purchase unreasonable amounts of inventory. Deposition testimony shows that the MPCs were priced according to a distributor price list and that the amounts required by the MPCs were below what each distributor actually would have purchased. Because the MPCs are not unreasonable, at prices above wholesale, or in amounts greater than the distributors would have purchased otherwise, they do not constitute indirect franchise fees.

■ Respondents also contend that consideration for the 1988 amended agreements constituted an indirect franchise fee. The consideration consisted of the divestment of the distributors' territorial exclusivity. Respondents argue that, at trial, they will value this consideration and show that it is worth more than the consideration given by appellant, and that this extra consideration consti-

tutes an indirect franchise fee. Respondents are unlikely to prevail on this claim, because it is contrary to both the statute and the language of the amended agreements.

First, nonmonetary consideration does not meet the statutory definition of a franchise fee as a "fee or charge." *See* Minn.Stat. § 80C.01, subd. 9 (defining "franchise fee" as a "fee or charge"); *cf. Unlimited Horizon Mktg., Inc. v. Precision Hub, Inc.,* 533 N.W.2d 63, 66–67 (Minn.App.1995) (monetary consideration, which the franchisee understood to be up-front money for the business relationship, was a franchise fee).

Second, the language of the amended agreements does not support respondents' argument. The consideration for the amended agreements consisted of a mutual exchange of promises. Appellant gave several types of monetary and nonmonetary consideration, and there is no evidence that this consideration was worth less than the consideration given by the distributors. Moreover, the agreements discuss the relinquishment of exclusivity only in terms of consideration and not as a franchise fee. The district court has ruled that the written agreements are fully integrated and unambiguous. Therefore, respondents cannot present other evidence to show that the parties meant for the consideration to be an indirect franchise fee.

Even if respondents could establish that they are franchisees, they likely would not prevail in showing that appellant breached the franchise act. Four claims under the franchise act survived summary judgment: (1) terminating or canceling a franchise, (2) offering and selling a franchise which includes an untrue statement of material fact or which omits to state a material fact necessary to make the statements made not misleading, (3) competing with respondents in their exclusive territories, and (4) failing to renew a franchise.

■ As to the first claim, respondents argue that appellant terminated the relationship in violation of the franchise act. "No person may terminate or cancel a franchise except for good cause." Minn.Stat. § 80C.14, subd. 3(b) (1996). The statute refers to termination during the term of the contract, however, which is not the situation in this case. The amended agreements expired by their own terms in 1995. Respondents may be arguing that the making of the distributor agreements when appellant acquired Airwick constituted termination. Those claims would be barred by the three-year statute of limitations for franchise act violations, however. *See* Minn.Stat. § 80C.17, subd. 5 (1996).

■ On this appeal, respondents have not argued their second and third claims of misrepresentation or competition in exclusive territories. Any misrepresentation would have been at the time of the agreements, and thus the claim is barred by the statute of limitations. With respect to the claim of competition, the agreements expressly state that they are nonexclusive. It is unfair to "compete with the franchisee in an exclusive territory." Minn. R. 2860.4400C (1997). Therefore, competition by appellant is not prohibited, and respondents are not likely to prevail on this claim.

■ The fourth claim for respondents is nonrenewal.

[N]o person may fail to renew a franchise unless (1) the franchisee has been given written notice of the intention not to renew at least 180 days in advance of the expiration of the franchise; and (2) the franchisee has been given an opportunity to operate the franchise over a sufficient period of time.

Minn.Stat. § 80C.14, subd. 4 (1996). Respondents have had a sufficient opportunity to continue in operation. They have remained in business for two years beyond the expiration of their contracts.

Respondents are not likely to succeed on their franchise act claims, because they cannot prove that they are franchisees. Even if they qualify as franchisees, it strikes this court that the relief they could obtain at best would be 180 days continued operations under the distributorship. Respondents have continued to operate since January 1, 1996, two years beyond the normal life of the written agreement and far in excess of any relief under the Minnesota Franchise Act.

## II. Relationship of the Parties

 The first *Dahlberg* factor considers the relationships of the parties. The relationship of the parties at the time the district court granted the injunction weighs in favor of vacating the injunction.

 The purpose of a temporary injunction is to preserve the status quo until judgment. *Pickerign v. Pasco Mktg., Inc.*, 303 Minn. 442, 446, 228 N.W.2d 562, 565 (1975). Generally, injunctive relief based on a contract must be coextensive with the terms of the contract. *Cherne*, 278 N.W.2d at 93.

*Pickerign* involved a series of six-month dealer agreements and a lease between a service station operator and a distributor. 303 Minn. at 443, 228 N.W.2d at 564. Either party could terminate the agreement at the end of any six-month term with 30 days notice. *Id.* The service station operator received notice of termination, and when the distributor refused to deliver gasoline after the termination date, the service station operator commenced a lawsuit. *Id.* at 443–44, 228 N.W.2d at 564. The trial court found that the plaintiff was barred from obtaining a temporary injunction under the contract, because he did not seek relief until after the contract had terminated. *Id.* at 444, 228 N.W.2d at 564. The supreme court determined that with respect to the lease, maintenance of the status quo required a continuation of the tenancy, and the court erred in denying an injunction. *Id.* at 446, 228 N.W.2d at 565. With respect to the dealer agreement, however, the status quo was that the agreement had terminated, and the trial court properly denied the temporary injunction. *Id.* at 447, 228 N.W.2d at 565.

In *Toro*, the parties had a series of one-year distributor agreements. 519 N.W.2d at 913. The manufacturer decided not to renew the agreement, and the distributor brought a suit under the Minnesota Franchise Act. *Id.* at 914. On appeal from a denial of a motion for an injunction, we considered whether the status quo would be preserved by a denial of an injunction. *Id.* at 915. We recognized that

an argument can be made that the status quo would continue [without an injunction] as the distributor agreement would have expired on its own terms. Thus, to treat the distributor agreement as effective would be beyond the terms of the agreement itself.

*Id.*

With respect to respondents Upper Midwest, Metro, and Cleancare, the district court dissolved the temporary restraining order on December 12, 1995. The hearing for the injunction was not held until January 1996, and the temporary injunction was not issued until March 1996. When the distributor agreements terminated on December 31, 1995, no injunction was in place and the parties had not negotiated any new agreements. As of January 1, 1996, the status quo was that the agreements had expired by their terms. Therefore, the issuance of an injunction for those three respondents in March did not preserve the status quo. Allpro is an even clearer case. Allpro did not file a lawsuit until April 1996, several months after the natural termination of its contract in December 1995. APP also was not operating under any current agreement when the injunction issued. The status quo may have been a continued relationship, but the court required a continuation under the terms of the amended agreements, which APP never had signed. The injunction did not maintain the status quo of any of the parties. It extended the relationship beyond that established in the clear terms of the contracts and thus violated the purpose of an injunction. *See Pickerign*, 303 Minn. at 446, 228 N.W.2d at 565 (purpose of injunction is to preserve status quo); *Cherne*, 278 N.W.2d at 93 (injunction based on a contract must be coextensive with the terms of the contract).

### III. Other Three *Dahlberg* Factors

In light of our decision that the franchise act does not apply, none of the three remaining factors sufficiently supports the injunction. Because the franchise act does not apply, there will be no irreparable harm to respondents, and they will have a remedy at law for damages. *See Toro*, 519 N.W.2d at 915 (assuming franchise act does not apply, legal remedy is available). Therefore, the

balance of harms factor supports our decision to dissolve the injunction. There are no public policy concerns at issue in this case. *See id.* at 915–16 (when franchise act is inapplicable, no public policy concerns need be considered). Finally, the injunction has placed administrative burdens on the court.

## IV. Balancing of Factors

The district court has abused its discretion, because the contract had expired before the injunction was ordered and there was no likelihood of success on the merits. As the supreme court has stated:

> The limited issue raised by the appeal is whether the order of the trial court constitutes a clear abuse of discretion. If it does, we should reverse because the judicial power must not be used, even temporarily, to compel the continuance of a business relationship which has proved unsatisfactory to one of the parties unless adequate reasons are established by the party seeking relief.

*Dahlberg,* 272 Minn. at 274, 137 N.W.2d at 321. If there is any claim remaining, it would be an action at law for breach of contract, which this court is not called upon to determine. The record is devoid of any claim of fraud or misrepresentation by appellant, and therefore there is no other equitable basis for this injunction. The relationship of the parties is terminated and the injunction quashed.

## DECISION

The district court abused its discretion in denying the motion to dissolve the temporary injunction.

**Reversed and remanded.**