# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1777

_____

Twin Cities Galleries, LLC, Larry    *
J. Digiovanni, Susan M. Digiovanni,    *
   *
      Plaintiffs/Appellees,    *
   *
      v.    *
   *
Media Arts Group, Inc., Lightpost    *
Publishing, Inc., Magi Sales, Inc.,    *
Richard F. Barnett, Thomas Kinkade,    *    Appeal from the United States
Kenneth E. Raasch,    *    District Court for the
   *    District of Minnesota.
      Defendants/Appellants,    *
   *
Pebble Beach Financial Services, Inc.,    *
Bud Petersen, Bob Martin, Craig    *
Fleming, John R. Lackner, Anthony    *
D. Thomopoulos,    *
   *
      Defendants.    *

_____

Submitted: October 18, 2006
Filed: February 9, 2007

_____

Before SMITH, BOWMAN, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Media Arts Group, Inc., and several affiliated parties (collectively, "Media Arts") appeal the district court's order vacating an arbitration award. The arbitrator dismissed claims made under the Minnesota Franchise Act against Media Arts by Twin Cities Galleries, LLC, and Larry and Susan DiGiovanni. The district court concluded that the panel's decision violated Minnesota's fundamental public policy of protecting its franchisees, and granted a motion to vacate the arbitrator's award. The court directed that the claims under the Minnesota Franchise Act be submitted to the arbitrator for decision. We reverse and remand with directions to confirm the arbitrator's final award.

I.

Between 1998 and 2002, Twin Cities Galleries, LLC, and the DiGiovannis owned and operated four galleries featuring the art of Thomas Kinkade, a prominent artist from California. For each gallery, the DiGiovannis and Twin Cities entered into "Dealer Agreements" with Media Arts Group, Inc., the exclusive manufacturer, marketer, and distributor of reproductions of Kinkade's original art. These agreements bound Twin Cities to purchase a minimum inventory for each of the galleries.

By 2002, the galleries had failed to generate the anticipated earnings, and Twin Cities fell behind in paying for inventory. Twin Cities and the DiGiovannis then sued Media Arts in federal court, alleging that they were fraudulently induced to open the galleries. The complaint asserted that the relationship between Twin Cities and Media Arts was an unregistered franchise, and that Twin Cities, as a purported franchisee, was entitled to the protections of the Minnesota Franchise Act ("MFA").

In September 2002, Media Arts commenced binding arbitration proceedings pursuant to the Dealer Agreements, and Twin Cities submitted its claims to the arbitration tribunal. The arbitration panel dismissed Twin Cities' claims under the

MFA, concluding that California law applied to the parties' relationship. On February 22, 2005, the panel denied all of Twin Cities' claims, including those made under the California Franchise Investment Law ("CFIL"). The panel found that Twin Cities and the DiGiovannis had not paid a "franchise fee" under the CFIL, and that the relationship was thus not subject to the provisions of the statute. On May 3, 2005, the panel issued a final award in favor of Media Arts.

Twin Cities moved in the district court to vacate the award, and Media Arts moved to confirm it. The district court vacated the award on the ground that it violated Minnesota's fundamental public policy of protecting its franchisees. The court reasoned that the Minnesota Franchise Act prohibits a franchisee from waiving its rights under the statute, *see* Minn. Stat. § 80C.21, and that applying California law to the parties' relationship effected a waiver of Twin Cities' rights. Believing that the Minnesota Franchise Act established "an explicit, well defined, and dominant public policy to protect Minnesota franchisees," the court concluded that the parties' agreement to apply California law violated Minnesota's public policy. (Add. at 13). Accordingly, the district court decided that the arbitration panel could not give effect to the parties' choice of California law without violating a fundamental public policy of Minnesota. On this basis, the court vacated the arbitration award and directed that the matter be returned for the arbitrator for a decision on Twin Cities' claims under the MFA.

## II.

The Federal Arbitration Act authorizes a district court to vacate an arbitration award in four limited circumstances. 9 U.S.C. § 10(a). In addition, however, we have said that an award may be vacated on the non-statutory basis that it is contrary to a "well-defined and dominant" public policy embodied in laws and judicial precedent. *PaineWebber, Inc. v. Agron*, 49 F.3d 347, 350 (8th Cir. 1995). We have relied on the Supreme Court's observation in *United Paperworkers Int'l Union, AFL-CIO v. Misco,*

*Inc.*, 484 U.S. 29 (1987), that this exception to the enforcement of arbitral awards is a "specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy." *Id*. at 42; *see also W.R. Grace Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum and Plastic Workers*, 461 U.S. 757, 766 (1983). In considering a district court's refusal to enforce an arbitral award, we review the court's legal conclusions *de novo*, and accept the facts as found by the arbitration panel. *Iowa Elec. Light & Power Co. v. Local Union 204 of IBEW*, 834 F.2d 1424, 1427 (8th Cir. 1987).

The parties dispute whether the "public policy exception" to enforcement of arbitral awards applies in a situation where the arbitration panel itself considered the public policies of Minnesota and California in determining which State's law should apply to the issues before it. Assuming for the sake of argument that a public policy of Minnesota may potentially override the arbitration panel's choice-of-law decision, the public policy exception will apply only if the application of California law is contrary to a fundamental public policy of Minnesota. To make this showing, Twin Cities must demonstrate, at a minimum, that California law is materially different from Minnesota law, such that the arbitrator's use of California law actually undermined the asserted Minnesota public policy to protect franchisees. *See Tele-Save Merch. Co. v. Consumers Distrib. Co., Ltd.*, 814 F.2d 1120, 1123 (6th Cir. 1987) (holding that party invoking public policy exception must show "that there are significant differences in the application of the law of the two states"). We conclude that no such difference exists.

For a relationship to be governed by franchise law, both States require that a distributor pay a "franchise fee." *See* Minn. Stat. § 80C.01(4)(a)(1)(iii); Cal. Corp. Code § 31005(a)(3). Media Arts argues that Twin Cities has failed to make the threshold showing that it paid a "franchise fee," so it is immaterial that the MFA provides broader *remedies* for franchisees than does the California statute. If the inquiry concerning what is a "franchise fee" is identical under Minnesota and

California law, then the arbitration panel's finding that the distributorship was not a franchise under California law would dictate the same result under Minnesota law, and it would preclude a finding that the application of California law frustrated a fundamental policy of Minnesota.

Twin Cities urges a subtle difference between California and Minnesota law defining franchises. The California statute declares that a commitment to purchase inventory is a "franchise fee" when the distributor must buy "a quantity of the goods in excess of that which *a reasonable businessperson normally would purchase* by way of a starting inventory or supply or to maintain a going inventory or supply." Cal. Corp. Code § 31011(a) (emphasis added). The text of the Minnesota statute does not address this possibility, but the Minnesota Court of Appeals has stated that a commitment to purchase inventory can be a franchise fee "if the distributors were required to purchase amounts or items that they would not purchase otherwise." *Upper Midwest Sales Co. v. Ecolab, Inc.*, 577 N.W.2d 236, 242 (Minn. Ct. App. 1998); *see also Hogin v. Barnmaster*, 2003 WL 21500044, at *5 (Minn. Ct. App. July 1, 2003); *Banbury v. Omnitron Int'l, Inc.*, 533 N.W.2d 876, 882 (Minn. Ct. App. 1995).

Twin Cities contends that these standards are different, because California law uses an objective standard involving a "reasonable businessperson," while Minnesota law applies a subjective standard based on what the specific purported franchisee would have purchased for inventory in the absence of an agreement. Seizing on these ostensibly different standards, Twin Cities argues that the minimum purchase commitments in the Dealer Agreements forced it to buy more inventory than it otherwise would have purchased, but not so much as to exceed what a "reasonable businessperson" would buy. Thus, Twin Cities asserts that it should be given an opportunity to prove to a new arbitration panel that it would have purchased less inventory had it not been subject to the minimum purchase requirement of the Dealer Agreements.

We disagree. A closer look reveals that the Minnesota decisions apply an objective standard comparable to California's in determining whether a minimum purchase commitment is an indirect franchise fee. In *Upper Midwest*, the court explained that the Minnesota standard required it to "consider whether the [minimum purchase] requirements were *unreasonable*." 577 N.W.2d at 242 (emphasis added). **Applying this standard**, the court concluded that a commitment to purchase a reasonable quantity of goods at a wholesale price was not a "franchise fee." *Id.* Similarly, the Minnesota Court of Appeals rejected a franchise claim when the required purchases were "within the *reasonable requirements* of the business," and not "unreasonable." *Am. Parts Sys., Inc. v. T & T Auto., Inc.*, 358 N.W.2d 674, 677 (Minn. Ct. App. 1984) (emphasis added). To avoid creating a franchise relationship, a minimum purchase requirement need only have a "valid business purpose." *OT Indus., Inc. v. OT-Tehdas Oy Santasalo-Sohlberg AB*, 346 N.W.2d 162, 166 (Minn. Ct. App. 1984); *see also Hogin*, 2003 WL 21500044, at *5 (rejecting claim under MFA where "the record does not support any claim that the required quantity was unreasonable"). Thus, Minnesota law does not require a fact-intensive inquiry into how much inventory a distributor would stock in the absence of a minimum purchase commitment. Instead, courts look to whether the commitment was "unreasonable," which is the language of an objective standard.

When we compare these decisions to the CFIL, we conclude that the inquiry under Minnesota law does not differ materially from that required by California law. In both States, courts look to whether the quantities purchased were so unreasonably large that they acted as a fee to enter into the business. The arbitration panel found that the Dealer Agreements did not require purchases beyond "that which a reasonable businessperson would purchase by way of a starting inventory or to maintain a going inventory or supply." (Appellants' App. at 190). This finding accommodates the public policy of Minnesota that a minimum purchase commitment be "within the reasonable requirements of the business," *Am. Parts*, 358 N.W.2d at 677, not be "unreasonable," *Upper Midwest*, 577 N.W.2d at 242, and have "a valid business

purpose." *OT Indus.*, 346 N.W.2d at 166. Because the Minnesota and California standards are virtually identical, Twin Cities cannot demonstrate that the arbitrator's application of California law frustrated a fundamental policy of Minnesota.[1]

\* \* \*

For the foregoing reasons, we reverse the judgment of the district court and remand with directions to confirm the arbitration award.

_____

_____

[1]At oral argument, Twin Cities suggested a second distinction, namely, that payments required *to continue* a distributorship are "franchise fees" under Minnesota law, Minn. Stat. § 80C.01(9), but not under California law. *See* Cal. Corp. Code § 31011 (referring to payments "to enter into" a business); *but cf.* "When Does an Agreement Constitute a 'Franchise?,'" Release 3-F (June 22, 1994), at ¶ 4(a), *available at* http://www.corp.ca.gov/commiss/rel3f.htm (visited Jan. 31, 2007) (setting forth administrative interpretation of statute to include "any fee or charge which the franchisee is required to pay . . . for the right *to engage* in business.") (emphasis added). Because this point was raised for the first time at oral argument, and has not been briefed, it is waived. *United States v. Mitchell*, 31 F.3d 628, 633 n.3 (8th Cir. 1994). We note, moreover, that if the inventory requirements were not unreasonably large, then it does not matter whether the purchases were made "to enter into" a business or "to continue" a business.