**In re NORTHEAST EXPRESS REGIONAL AIRLINES, INC., and Precision Valley Aviation, Inc., Debtors.**

**Joseph V. O'Donnell, Chapter 7 Trustee, Plaintiff,**

v.

**Northwest Airlines, Inc., Defendant.**

**Joseph V. O'Donnell, Chapter 7 Trustee, Plaintiff,**

v.

**Northwest Airlines, Inc., Defendant.**

**Northeast Express Regional Airlines, Inc. and Precision Valley Aviation, Inc., Plaintiffs,**

v.

**Northwest Airlines, Inc., Defendant.**

**Bankruptcy Nos. 94–20409, 94–20410. Adversary Nos. 94–02032, 94–02033, 94–02058.**

United States Bankruptcy Court, D. Maine.

Dec. 8, 1998.

See also 169 B.R. 258.

George J. Marcus, Marcus, Grygiel & Clegg, P.A., Portland, ME, for debtors.

Stephen G. Morrell, Eaton, Peabody, Bradford & Veague, Brunswick, ME, for plaintiff.

Gregory A. Tselikis, Bernstein, Shur, Sawyer & Nelson, Portland, ME, Lenard M. Parkins, Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, Houston, TX, for defendants.

## MEMORANDUM AND DECISION

JAMES A. GOODMAN, Bankruptcy Judge.

On October 28, 1998, the Court conducted a non-evidentiary hearing on various motions for summary judgment, a motion for judgment on the pleadings, and motions to strike certain summary judgment evidence. After consideration of the motions, the affidavits, exhibits, and arguments of counsel, we grant Northwest's Motion for Summary Judgment regarding Count II of the Trustee's Complaint in A.P. Nos. 94–02033 and 94–02032 raising certain claims under the Minnesota Franchise Act. The balance of the motions in these two adversary proceedings are denied. In Adversary Proceeding No. 94–02058 wherein the Trustee seeks to surcharge Northwest, pursuant to 11 U.S.C. §§ 105 and 506(c), we grant Northwest's Motion for Summary Judgment and enter judgment in favor of Northwest.

## BACKGROUND

Northeast Express Regional Airlines Inc. (hereinafter "NERA") and Precision Valley Aviation, Inc. (hereinafter "PVA") were two regional, commuter airlines with principal operations in the state of Maine. In 1989, Northwest Airlines, Inc. (hereinafter "Northwest"), was seeking to strengthen its presence in New England by expanding its jet capacity in Boston, Massachusetts. To further that goal, on May 2, 1989, Northwest entered into an Airline Service Agreement with PVA and on January 5, 1990, it entered into a similar agreement with NERA. Both Airline Service Agreements (hereinafter "ASA") were amended by various letter agreements which *inter alia* provided PVA and NERA with additional compensation. Both ASAs expired by their own terms on December 1, 1994.

Pursuant to the terms of the ASAs, both PVA and NERA identified their commuter airline as "Northwest Airlink" and flew under Northwest's designation code, colors and logo. The Agreements provided that Northwest would pay NERA and PVA for each passenger flown and ticketed on a Northwest flight based on a "straight-rate prorate" formula. Both Agreements contained an integration clause stating that the ASAs constituted the full agreement between the parties and could only be modified by a duly executed subsequent writing. Additionally, the ASAs provided that the agreements shall be governed according the laws of the State of Minnesota.

NERA and PVA, while operating under the ASAs, requested continual financial accommodations from Northwest which was often granted and evidenced by a written amendment to the ASAs. On May 25, 1994, Northwest sent written notice of default to PVA and NERA providing them with notice that the ASAs would terminate in six months. On May 28, 1994, NERA and PVA filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

On June 6, 1994, NERA and PVA filed separate Verified Complaints against Northwest commencing the above-captioned adversary proceedings (A.P. Nos. 94–2032 and 94–2033—hereinafter the "Unjust Enrichment Litigation"), seeking declaratory and injunctive relief and damages. On June 8, 1994, the Debtors amended their Complaints seeking *inter alia* to enjoin Northwest from recouping pre-filing debt against post-filing income due the Debtors. I conducted an evidentiary hearing on the Debtors' request for injunctive relief and on June 20, 1994, I denied the Debtors' request finding that: "the principle of recoupment directly applies and, as a result, Debtors' entitlement to all post filing revenues due from Northwest under the terms of the ASA may be recouped

by Northwest up to the amount of $9.84 million, reduced only by whatever adjustments Debtors may be entitled to." Order, A.P. Nos. 94–2032; 94–2033, slip op. at 6, June 20, 1994.

Joseph V. O'Donnell, the Chapter 7 trustee of the NERA and PVA bankruptcy estates, has been substituted as the Plaintiff in these proceedings. On August 16, 1994, PVA and NERA filed a Second Amended Verified Complaint alleging, *inter alia,* that Northwest violated the Minnesota Franchise Act, Minn.Stat. § 80C.01 *et seq.* (hereinafter "MFA"). The Trustee describes the nature of the Unjust Enrichment Litigation as follows:

> [The] Amended Complaint seeks equitable relief because Northwest manipulated the debtors by means of control, concealment and subterfuge. As of the date of the petition, Northwest was $30,000,000.00 richer than it was when the ASAs were signed. The Debtors were crushed in the process. The Trustee's Amended Complaint seeks to recover these benefits bestowed upon Northwest.

Trustee's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Docket No. 124, p. 2.

On August 29, 1994, NERA and PVA filed another Adversary Proceeding against Northwest, A.P. No. 94–2058 (hereinafter the "Surcharge Litigation"), seeking to surcharge Northwest the sum of $1,129,382 for post-petition liabilities incurred by the Debtors. The Trustee alleges that Northwest received $3,625,393 as a result of the Debtor's post-petition operations through June 21, 1994, and remitted only $2,279,495 to the Debtors, leaving Northwest with a profit of $1,345,898 from the Debtors' post-petition efforts. The Trustee argues that Northwest should be surcharged the amount of the unpaid post-petition liabilities ($1,129,382), pursuant to 11 U.S.C. § 506(c), or alternatively § 105(a), because these expenses were incurred for Northwest's benefit.

*The Pending Motions in the Unjust Enrichment Litigation:*

On January 22, 1996, Northwest filed a Motion seeking Partial Summary Judgment on the Trustee's MFA claims. Northwest argues that: (1) the ASAs do not constitute a franchise agreement; (2) the Debtors never paid a franchise fee to Northwest; (3) prior to the Franchise Act's amendment in 1993, the Act did not allow for the recovery of monetary damages; (4) prior to the Franchise Act's amendment in 1993, the Act required violations to be raised within three years of the payment of the first franchise fee, and the Debtors commenced suit four years after payment of the purported franchise fee. The Trustee objects, arguing that a genuine issue of material fact exists concerning the true character of the fees paid by the Debtors to Norwest. The Trustee also argues that the 1993 amendments to the MFA apply retroactively, thereby allowing for damages.

On October 31, 1997, Northwest filed a Motion for Summary Judgment as to the Trustee's Amended Complaint. By this Motion, Northwest incorporated the prior arguments made in its Motion for Partial Summary Judgment regarding the MFA claims. It also argues that the Minnesota legislature amended the Act on May 30, 1997, specifically excluding air carriers from its reach and the amendment was given retroactive effect. Northwest asserts several other arguments concerning the Trustee's remaining claims including *inter alia,* that the Trustee lacks standing to pursue these claims for the benefit of creditors, the statute of frauds and the parole evidence rule prohibit the Trustee's claims, and under the ASAs, the Debtors expressly assumed the risk of financial loss. Additionally, Northwest argues that this Court's Order dated June 20, 1994, denying the Debtors' request for injunctive relief collaterally estops the Trustee's attempts to hold Northwest liable on alleged extra-contractual claims. Northwest argues that this Court's finding that "all sums due and owing Northwest pre-filing by Debtors have arisen from and are directly related to the ASAs," precludes the Trustee from arguing that another agreement governs the legal relationship between the parties.

The Trustee objected to Northwest's motion arguing *inter alia,* that his case has nothing to do with the enforcement of promises made by Northwest. Rather, he seeks

equitable relief based upon Northwest's manipulation of the Debtors and subterfuge. The Trustee alleges that Northwest was unjustly enriched by its wrongful actions to the tune of $30,000,000. On October 31, 1997, the Trustee filed a Motion for Summary Judgment, echoing many of the same arguments.[1]

On December 15, 1997, Northwest filed a Motion to Strike the Trustee's Summary Judgment evidence. Northwest seeks to strike the Trustee's "Factual Predicates" included in his Memorandum in Support of Summary Judgment, because they constitute mere argument and not facts. Additionally, Northwest argues that several paragraphs of the Trustee's Statement of Material Facts ought to be stricken because they contain misstatements of facts. Finally, Northwest seeks to strike various exhibits to the Metcalf Declaration because they are not properly authenticated. On December 24, 1997, Northwest filed another Motion to Strike the Trustee's Summary Judgment Evidence, seeking to strike various exhibits to the Second Unsworn Metcalf Declaration because, *inter alia*, they were not properly authenticated.

On March 31, 1998, Northwest filed a Suggestion of Fraud on the Court, wherein Northwest states that David Hulick, a principal and former Chief Financial Officer of the Debtors, admitted to defrauding Northwest by submitting false revenue requests to Northwest from 1992 through 1994. Based upon this newly discovered fraud, on June 16, 1998, Northwest filed a Supplemental Motion for Partial Summary Judgment, arguing that Hulick's fraud taints the Trustee and bars his claims for equitable relief under the doctrine of "unclean hands." Additionally, on June 16, 1998, Northwest filed a Motion for Judgment on the Pleadings regarding the Trustee's MFA claims, arguing for the first time that the Debtors cannot claim the protections of the MFA because they were never Minnesota franchisees. The Trustee has objected vehemently to these recent filings by

Northwest. Included within this recent volley of filings is yet another motion by Northwest to Strike portions of the Metcalf Declaration submitted by the Trustee in support of his opposition to Northwest's recent motions.[2]

*The Motions Pending in the Surcharge Litigation:*

On October 31, 1997, Northwest filed a Motion for Summary Judgment arguing *inter alia* that it is not a secured creditor and therefore Section 506(c) is inapplicable. Additionally, Northwest contends that by virtue of this Court's June 20, 1994 Order wherein Northwest was allowed to assert its recoupment rights against post-petition income earned by the Debtors under the ASAs, these funds are owned by Northwest and are not property of the estate. The Trustee filed an objection agreeing that there were no material facts in dispute but argues that Section 105 and the theory of unjust enrichment should allow him to prevail in this instance.

### DISCUSSION

Motions for summary judgment are governed by Fed.R.Bankr.P. 7056 which applies and incorporates Rule 56 of the Federal Rules of Civil Procedure in bankruptcy proceedings. The rule states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The First Circuit BAP has recently summarized the standard for summary judgment as follows:

> "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st

---

1.  The Trustee also sought summary judgment on two preference counts raised in the Complaint. At oral argument, the Trustee withdrew his Motion for Summary Judgment on these preference claims.

2.  By now, the posture of this litigation should be abundantly clear from the litany of pending disputes.

Cir.1990); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour [v. Dynamics Research Corp.],* 63 F.3d [32] at 37 [(1st Cir.1995), *cert. denied,* 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996)] (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers,* 902 F.2d at 143 (*quoting Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511) (citations and footnote in *Anderson* omitted). We "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour,* 63 F.3d at 36. *Borschow Hosp. and Medical Supplies, Inc. v. Cesar Castillo Inc.,* 96 F.3d 10, 14 (1st Cir.1996). In summary judgment parlance, a dispute is "genuine" if " 'the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" *Rivera–Muriente v. Agosto–Alicea,* 959 F.2d 349, 352 (1st Cir.1992) (*quoting United States v. One Parcel of Real Property, Etc.,* 960 F.2d 200, 204 (1st Cir.1992)). "A fact is material if it 'carries with it the potential to affect the outcome of the suit under the applicable law.'" *One National Bank v. Antonellis,* 80 F.3d 606, 608 (1st Cir.1996) (*quoting Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir. 1993)). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Thus, the substantive law defines which facts are material. *Id.* at 248, 106 S.Ct. at

2510. *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996).

*Weiss v. Blue Cross/Blue Shield,* 206 B.R. 622, 624 (1st Cir. BAP 1997).

*The Unjust Enrichment Litigation:*

One thing that all the parties to this litigation can agree upon is that there exists very few facts upon which there is no material dispute. The Trustee stated in oral argument that out of this sea of disputed facts, he would build a bridge made of undisputed facts upon which this Court could cross and grant his Motion for Summary Judgment. Unfortunately for the Trustee, he has not succeeded in that task. Reading the papers and hearing the parties argue, it is as though I was hearing two different cases. Due to the inordinate number of material facts in dispute, I find this matter is not ripe for summary judgment for either party, with one exception. I believe that there is no dispute as to any material facts concerning Count II of the Second Amended Complaint raising claims under the MFA, and Northwest is entitled to judgment on those claims as a matter of law. Upon consideration, I grant Northwest's Motion for Summary Judgment as to that Count only.[3] In reviewing Northwest's three Motions to Strike the Summary Judgment Evidence, I find that while the motions may raise proper technical objections, Northwest is not prejudiced by the admission of the summary judgment evidence. Accordingly, all three Motions to Strike are denied.

In support of summary judgment on the MFA claims, Northwest argues that the MFA was intended and designed to protect franchisees within the state of Minnesota only. It states that because NERA is a Delaware Corporation and PVA is a Vermont Corporation, both of whom conducted all of their business affairs in the Northeast, they are ineligible for protection under the MFA and the Trustee lacks standing to bring such a suit under the statute. Northwest cites to cases emanating from the Minnesota courts

3. Because Northwest has raised several arguments concerning the Franchise Act Claims in three different motions—Motion for Partial Summary Judgment, Motion for Summary Judgment, and a Motion for Judgment on the Pleadings—I will treat all the arguments as having been raised on summary judgment.

which stand for the proposition that: "Chapter 80C was adopted in 1973 as remedial legislation designed to protect potential franchisees within Minnesota from unfair contracts and other prevalent and previously unregulated abuses in a growing national franchise industry." *Martin Investors, Inc. v. Vander Bie,* 269 N.W.2d 868, 872 (Minn. 1978); *Clapp v. Peterson,* 327 N.W.2d 585, 586 (Minn.1982); *Pacific Equip. & Irrigation Inc. v. Toro Co.,* 519 N.W.2d 911, 916 (Minn. Ct.App.1994).

Northwest also directs the Court to the legislative history which describes the MFA as a "bill to give the commissioner of securities some control over the franchising business in the state of Minnesota ." Hearing on the Minnesota Franchise Act Before the Minnesota Senate, 68th Legis., Reg.Sess. (Minn.1973) (Statement by an unidentified senator). To further bolster its argument, Northwest points to Section 80C.03(h) which explicitly exempts the Acts registration and disclosure requirements when a franchise sale is made to a non-resident franchisee. *See* Minn.Stat. § 80C.03(h).

In response, the Trustee argues that the determinative factor is where the franchisor makes the offer to sell the franchise. If the offer is made in the state of Minnesota, the MFA applies. The Trustee concedes that he has found no cases directly on point, or any case that applies the provisions of the MFA to a non-resident franchisee.

■ We agree with Northwest that the Debtors cannot claim the protections afforded under the MFA because they are not franchisees within Minnesota. The Minnesota Supreme Court has stated that the MFA was designed to protect franchisees within Minnesota and this is supported by the legislative history. *See Martin Investors,* 269 N.W.2d at 872. The legislature further evidenced its intent to protect Minnesota franchisees when it amended the MFA in 1989, providing that any waiver of compliance with the MFA by a Minnesota franchisee is void. The statute states:

4. I want to make it abundantly clear that in accepting Northwest's arguments above, I am specifically rejecting Northwest's argument that

Any condition, stipulation or provision, including any choice of law provision, purporting to bind any person who, at the time of acquiring a franchise is a resident of this state, or, in the case of a partnership or corporation, organized or incorporated under the laws of this state, or purporting to bind a person acquiring any franchise to be operated in this state to waive compliance or which has the effect of waiving compliance with any provision of sections 80C.01 to 80C.22 or any rule or order thereunder is void.

Minn.Stat. § 80C.21. Clearly, the intent is to protect Minnesotans. Furthermore, there is no intent expressed by the legislature to apply the provision of the MFA extraterritorially. Absent such an intent by the legislature, courts have been reluctant to extend franchise laws to out of state franchisees, even when the franchise agreement dictates that the law of a particular state governs the agreement. *See Highway Equip. Co. v. Caterpillar Inc.,* 908 F.2d 60, 62–64 (6th Cir. 1990) (finding that Illinois Franchise Disclosure Act did not apply to a franchisee from Ohio despite a contractual choice-of-law provision stating that Illinois law governed); *McDonald's Corp. v. C.B. Management Co., Inc.,* 13 F.Supp.2d 705, 713–14 (N.D.Ill.1998) (declining to extend Illinois Franchise Disclosure Act to an Ohio franchisee even though the parties agreed Illinois law would govern); *Peugeot Motors of America, Inc. v. Eastern Auto Distribs., Inc.,* 892 F.2d 355, 358 (4th Cir.1989), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990) (denying a Virginia franchisee protection of New York franchise law notwithstanding a choice of law provision specifying that New York law shall control). I also decline to extend the MFA extraterritorially to cover the Debtors, especially where the Minnesota legislature has expressed an intent to the contrary.

■ I also agree with Northwest that even if the MFA were found to apply in this case (which it does not), the ASAs are not franchise agreements because the Debtors have never paid a franchise fee to Northwest.[4]

the May 30, 1997 amendments to MFA excludes air carriers from the scope of the MFA and that exclusion applies retroactively to the instant

The Trustee cites to no case where an Airline Service Agreement has been found to constitute a franchise agreement and we are unable to find one. Under the MFA, a franchise is defined as:

(a) a contract or agreement, either express or implied, whether oral or written, for a definite or indefinite period, between two or more persons:

(1) by which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service mark, logotype, advertising, or other commercial symbol or related characteristics;

(2) in which the franchisor and franchisee have a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise; and

(3) for which the franchisee pays, directly or indirectly, a franchise fee;

Minn.Stat. § 80C.01 Subd. 4. All three elements must be present for the court to find the existence of a franchise. *See RJM Sales & Marketing, Inc. v. Banfi Prods. Corp.*, 546 F.Supp. 1368, 1373 (D.Minn.1982). A franchise fee is defined as:

any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any pay-

ment for goods or services, or any training fees or training school fees or charges. Minn.Stat. § 80C.01 Subd. 9.

The Trustee contends the Debtors paid a franchise fee in two ways: First, the Debtors were required to post a letter of credit as a condition of continuing the relationship under the ASAs. The Trustee argues that the fee paid to maintain the letter of credit, even though it was not paid to Northwest, constitutes an indirect franchise fee. This argument is ludicrous, and it is rejected. It is undisputed that the letters of credit were posted to serve as security for a $2 million advance made by Northwest at the inception of their relationship. Under the Tri–Party Agreement dated November 21, 1989, PVA chose to collateralize the $2 million advance by posting a letter of credit. *See* Northwest Exhibits to Motion For Summary Judgment, Volume I, Exhibit 10, Agreement, p. 13. PVA had three choices under the agreement. *Id.* It could either agree to repay the advance over the term of the ASA, provide Northwest with other adequate collateral, or post a letter of credit. *Id.* It chose a letter of credit which was renewed on several occasions, and I find that the letters of credit were security for the advances and do not constitute a direct or indirect franchise fee as a matter of law.

Second, the Trustee argues that the $10 fee charged by Northwest at Boston Logan Airport for each flight in and out constitutes a franchise fee because Northwest required payment of the fee from the Debtors and Northwest provided no services in return for the fee. This argument is also without merit. On February 2, 1990, PVA entered into a Support Services Agreement wherein it expressly agreed to pay Northwest the $10 fee in exchange for Northwest providing ground

case. *See* Northwest's Memorandum in Support of Summary Judgment, Docket No. 110, pp. 42–43. What Northwest failed to disclose to this Court is that the amendment was brought about by its extensive lobbying efforts and when the legislature learned that Northwest had litigation pending in this Court, it repealed the amendment's broad reaching retroactive effect. Clearly the MFA has been amended to exclude air carriers, but the amendment does not apply "to any agreements or arrangements subject to litigation pending on the date of enactment wherein such

agreements or arrangements are alleged to constitute a franchise within the meaning of Minnesota Statutes." Minnesota Laws 1997, ch. 222, § 61. In all of the reams of paper filed with this Court by Northwest, it never once told the Court that it was no longer relying on the above argument because the Minnesota legislature amended the retroactive effect of the May 1997 amendment exempting air carriers from the act. I believe Northwest violated its duty of candor to this Court.

handling and related services. *See* Northwest Exhibits to Motion For Summary Judgment, Volume I, Exhibit 17, Agreement p. 2 and Exhibit B to Agreement. Additionally, the Agreement stated that either party may terminate the agreement upon 30 days written notice to the other party. *Id.* Agreement, p. 14. Under these circumstances, I find that the $10 fee charged is not a franchise fee as defined by the MFA.

■ Finally, I also agree with Northwest's argument that the 1993 amendments to the MFA allowing the recovery of damages for violations of the MFA can not apply retroactively. In 1993, the legislature amended the MFA to allow for civil damages and reasonable attorney fees when the franchisor commits unfair and deceptive acts. *See Minn. Stat.* §§ 80C.14 and 80C.17. The 1993 amendments apply, as of July 1, 1993, to franchise contracts in effect on the effective date that have no expiration date. *See* Minnesota Laws 1994, c. 485, S 64. Both ASAs pre-date the amendment and had an expiration date of December 1, 1994. Accordingly, the amendment providing for damages does not apply retroactively to this case.

■ I wish to briefly address two other points raised by Northwest in its Summary Judgment Motion. First, I reject Northwest's contention that the Trustee lacks standing to bring the remaining counts of his Second Amended Complaint. It is the Trustee's contention that Northwest's course of dealing caused financial injury to the Debtors. To find that the Chapter 7 trustee lacks standing to pursue a cause of action on behalf of the Debtors is contrary to settled law. Indeed, it is a duty of the Chapter 7 Trustee to pursue such matters expeditiously and reduce such claims to money for the benefit of creditors. *See* 11 U.S.C. § 704(1).

■ Second, Northwest's suggestion that this Court's June 20, 1994 Memorandum of Decision decided all matters in the case and collaterally estops the Trustee from litigating further is rejected. The memorandum of decision is clear in its findings and need not be restated again herein. Those findings without question are final and binding as law of the case. *See CPC Int'l, Inc. v. North-*

*brook Excess & Surplus Ins. Co.,* 839 F.Supp. 124, 125 (D.R.I.1993), *aff'd* 46 F.3d 1211 (1st Cir.1995) (the law of the case doctrine holds that a decision made on an issue of law at one stage of the case becomes binding precedent in successive stages of the same litigation). However, to say that this Court decided every possible claim the estate had against Northwest in a hearing on a motion for a *temporary restraining order* is absurd. Such was not the intention of the parties at the time of the hearing nor was it this Court's intent.

*The Surcharge Litigation:*

■ Under the arrangement contemplated by the ASAs, passengers would pay their fare to an agent, who, in turn, would remit the proceeds, less a commission to the Airlines Revenue Clearing House ("ARC"). ARC would then pay the proceeds to Northwest, who then pays the Debtors their share of the proceeds based upon the agreed formula. During the post-petition period from May 30, 1994 through June 21, 1994, the Debtors billed Northwest $3,625,393 in connection with passengers flown by the Debtors for Northwest. For the period, Northwest wire transferred $2,279,495 to the Debtors and of that amount, $1,480,000 represented amounts advanced by Northwest on account of Interim Cash Collateral Orders. The Trustee seeks to surcharge Northwest the sum of $1,129,382—the total unpaid postpetition expenses incurred by the estate during the five week period in question. The Trustee principally relies on 11 U.S.C. § 506(c).

Section 506(c) states: "The trustee may recover from property securing *an allowed secured claim* the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." (Emphasis added). Northwest's argument in support of summary judgment is that it is not a secured creditor and therefor § 506(c) is inapplicable, and I agree.

By its explicit terms, Section 506(c) applies to holders of "allowed secured claims." An allowed secured claim is defined as a claim "secured by a lien on property in which the

estate has an interest ... to the extent of the value of such creditor's interest in the estate's interest in such property." 11 U.S.C. § 506(a). If the party attempting to be surcharged owns the funds in question, application of 506(c) is inappropriate. *See Bear v. Coben (In re Golden Plan, Inc.)*, 829 F.2d 705, 712–13 (9th Cir.1986). While the interim cash collateral orders contemplated that Northwest may be a secured creditor, that was conditioned upon the outcome of the recoupment dispute decided by this Court on June 20, 1994. In fact the parties have stipulated as an undisputed fact that:

> The grant of adequate protection to Northwest [in the Interim Cash Collateral Orders] was to protect Northwest until the Court determined whether or not Northwest had a right of recoupment. Specifically, if Northwest was not entitled to recoupment, the post-petition ticket proceeds would constitute property of the Debtors' estates and Northwest would have a first priority lien in such proceeds to adequately protect cash advances made by Northwest under the Interim Orders. On the other hand, in the event Northwest was entitled to recoupment, all post-petition ticket proceeds would belong to Northwest and would therefore not constitute property of the Debtors' estates or cash collateral.

Northwest's Exhibits in Support of Motion for Summary Judgment, Exhibit 1, Stipulated Findings of Fact, p. 7, ¶ 23. In my June 20, 1994 Order, I found that under the terms of the ASAs, Northwest was entitled to recoup its pre-filing debt from post-petition revenues up to the amount of $9.84 million, reduced only by whatever adjustments the Debtors may be entitled. It is undisputed that Northwest has not even come close to recouping its entire $9.84 million claim. Accordingly, I agree with Northwest that based upon the Court's June 20, 1994 Order, the estate has no interest in the post-petition income generated under the ASAs and such proceeds belong to Northwest unfettered by Section 506(c).

The Trustee presses an alternative argument that the Court should grant the relief he seeks under Section 105(a). That section states: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). It is beyond dispute that Section 105 does not allow the Court to create rights that run contrary to a specific statutory basis for the relief requested. The United States District Court for the District of Maine summarized the application of Section 105 as follows:

> The First Circuit has stated that "even as a court of equity ... the bankruptcy court's equitable discretion [deriving from section 105] is limited and cannot be used in a manner inconsistent with the commands of the Bankruptcy Code." *In re Plaza de Diego Shopping Center, Inc.*, 911 F.2d 820, 830 (1st Cir.1990); *accord, United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986) ("While the bankruptcy courts have fashioned relief under section 105(a) in a variety of situations, the powers granted by that statute may be exercised only in a manner consistent with the provisions of the bankruptcy code. That statute does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity").

*Wilner Wood Prods. Co. v. Maine*, 128 B.R. 1, 3 (D.Me.1991). Section 506(a) governs surcharging secured creditors and is the only Code provision relating to surcharge. Section 105 cannot be used to expand the rights provided for in Section 506(c). *See Golden Plan*, 829 F.2d at 713 (declining to use § 105 to expand the surcharge provisions of § 506(c)).

For the foregoing reasons, I find that Northwest is entitled to judgment as a matter of law, and the Trustee Complaint in A.P. No. 94–02058 is denied and dismissed. Final judgment shall enter in this adversary proceeding.

### Conclusion

Based upon the foregoing it is hereby ordered that:

(1) In Adversary Proceeding Numbers 94–02033 and 94–02032:

(a) Northwest's three Motions to Strike the Trustee's Summary Judgment Evi-

dence, Docket Numbers 121, 126, and 150 are DENIED;

(b) Northwest's Supplemental Motion for Partial Summary Judgment, Docket Number 138, is DENIED;

(c) Northwest's Motion for Judgment on the Pleadings, Docket Number 136, is treated as a motion requesting summary judgment on Count II of the Trustee's Second Amended Complaint and is GRANTED;

(d) Northwest's Motion for Partial Summary Judgment, Docket Number 31, and Northwest's Motion for Summary Judgment, Docket number 107, are GRANTED as to Count II of the Trustee Second Amended Complaint only and the Trustee's Minnesota Franchise Act Claims are Dismissed;

(e) The Trustee's Motion for Summary Judgment, Docket Number 111 is DENIED; and

(f) A Final·Pre–Trial Order will issue this same date setting all remaining matters for trial on the merits commencing January 25, 1999.

(2) In Adversary Proceeding Number 94–2058:

Northwest's Motion for Summary Judgment, Docket Number 49 is GRANTED. Judgment shall enter for Northwest and the Trustee's Complaint is DENIED and DISMISSED.

SO ORDERED.