In re NORTHEAST EXPRESS RE-
GIONAL AIRLINES, INC., and Preci-
sion Valley Aviation, Inc., Debtors.

Bankruptcy Nos. 94–20409, 94–20410.

United States Bankruptcy Court,
D. Maine.

July 15, 1999.

Stephen G. Morrell, Eaton, Peabody,
Bradford & Veague, P.A., Brunswick, ME,
for trustee.

## MEMORANDUM AND DECISION

JAMES A. GOODMAN, Bankruptcy
Judge.

Heard on March 24, 1999, on the final
fee application of Stephen G. Morrell,
Esq., and the firm of Eaton, Peabody,
Bradford & Veague (hereinafter "Morrell")
as counsel to the Chapter 7 Trustee in the
above captioned case. After hearing argu-

ment in support of the Application from Mr. Morrell, I took the matter under advisement and the matter is now ripe for disposition.

## BACKGROUND

Northeast Express Regional Airlines Inc. (hereinafter "NERA") and Precision Valley Aviation, Inc. (hereinafter "PVA") were two regional, commuter airlines with principal operations in the state of Maine. On May 28, 1994, NERA and PVA filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The cases were subsequently converted to Chapter 7 and Joseph V. O'Donnell was appointed as Chapter 7 Trustee. On June 21, 1995, I approved the Trustee's application to employ Morrell and his firm as counsel to the Trustee for the purpose of prosecuting claims against Northwest Airline, Inc. (hereinafter "Northwest"). Morrell is seeking compensation and reimbursement of expenses for services rendered in connection with three adversary proceedings (A.P.Nos.94–02032, 94–02033, 94–02058) prosecuted against Northwest (hereinafter "the Northwest Litigation").

To date, Morrell has been paid fees totaling $157,320 and expenses of $67,452 for services rendered in the Northwest Litigation. The litigation has now concluded and before the Court is Morrell's final fee application covering the period of November 1, 1996 through February 12, 1999, wherein he seeks an additional $437,875[1] and expenses of $2,744.22 from this estate. The applicant has billed for 3,866.30 hours composed of attorney, paralegal, and summer intern time, and this equates to a blended hourly rate of $113.25.

## DISCUSSION, FINDINGS, AND CONCLUSIONS

Compensation to professionals is governed by Section 330 which states, *inter alia:*

(a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award

. . .

(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B) reimbursement for actual, necessary expenses.

(2) The court may, on its own motion . . . award compensation that is less than the amount of compensation that is requested.

(3)(A) In determining the amount of reasonable compensation to be awarded, the court *shall* consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

. . .

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

. . .

(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for—

(i) unnecessary duplication of services; or

(ii) services that were not—

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

11 U.S.C. § 330. The Bankruptcy Appellate Panel for the First Circuit has recently stated:

The lodestar approach is the standard applied by courts in the First Circuit

---

1. Morrell voluntarily reduced his fee application by $34,460 and this final request reflects that reduction.

when reviewing applications for compensation. *Boston & Maine Corp. v. Moore,* 776 F.2d 2, 6–7 (1st Cir.1985); *Furtado v. Bishop,* 635 F.2d 915, 920 (1st Cir.1980); *In re Bank of New England Corp.,* 142 B.R. 584, 586 (D.Mass. 1992). The lodestar is calculated by multiplying the number of hours reasonably incurred by the applicant by a reasonable hourly rate. *Furtado,* 635 F.2d at 920. After the lodestar is determined, the court may adjust the lodestar upward or downward based upon consideration of other factors, including the result or benefit to the Debtor's estate of the services performed by the professional seeking compensation, if this has not already been considered in determining the lodestar. *Boston & Maine Corp. v. Moore,* 776 F.2d at 7; *Casco Bay Lines,* 25 B.R. at 756; *Swansea [Consol. Resources, Inc.],* 155 B.R. [28] at 31 [ (Bankr.D.R.I.1995) ].

*Garb v. Marshall (In re Narragansett Clothing Co.),* 210 B.R. 493, 497–98 (1st Cir. BAP 1997).

 The number of hours reasonably expended involves the consideration of a number of factors and "the hours actually expended by an attorney do not necessarily constitute the hours reasonably expended. The court 'should review the work done to see whether counsel substantially exceeded the bounds of reasonable effort.'" *In re Casco Bay Lines, Inc.,* 25 B.R. 747, 755 (1st Cir. BAP 1982) (*quoting, Pilkington v. Bevilacqua,* 632 F.2d 922, 925 (1st Cir.1980)). In determining the reasonableness of the time expended, the following factors, originally identified in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974), and adopted by the First Circuit in *King v. Greenblatt,* 560 F.2d 1024 (1st Cir.1977), are relevant: (1) the time and labor required, considering the novelty and difficulty of the questions presented; (2) the opposition encountered; (3) the amount involved; and (4) the disallowance of duplicative hours. *Casco Bay Lines, Inc.,* 25 B.R. at 755. In reviewing the instant application according to these standards, I have the most difficulty with the number of hours *reasonably* expended by the applicant considering the benefit obtained.

The majority of time spent by Morrell was in prosecuting two of the three adversary proceedings (A.P.Nos.94–02032, 94–02033), where the Trustee sought declaratory and injunctive relief and damages against Northwest. The Trustee alleged that Northwest manipulated and controlled the Debtors by means of concealment and subterfuge and otherwise violated the provisions of the Minnesota Franchise Act, Minn.Stat. § 80C.01, et seq. Through its actions, the Trustee contended that Northwest enriched itself to the tune of $30,000,-000 at the expense of the Debtors, and the Trustee sought to recoup that sum for the benefit of the estate.

On the eve of trial the Successor Trustee, William H. Howison, Esq., filed an application to compromise the litigation. In exchange for mutual releases, Northwest agreed to: (1) Pay the sum of $650,-000 to the estate. Of this sum, $150,000 would be paid back to Northwest on account of its Section 507(b) priority claim, and, in turn, Northwest agreed to use that $150,000 to purchase from the estate all allowed Section 507(a)(3) employee priority wage claims;[2] and (2) Northwest agreed to withdraw with prejudice its claims against the estate aggregating approximately $10,000,000.[3] On April 23, 1999, I approved the compromise.

The compromise was a far cry from the $30,000,000 figure bandied about by Morrell throughout the litigation. Mr. Morrell's belief as to the value of the litigation was unreasonable and the fact that he

---

**2.** Essentially this mechanism insured that $150,000 of the settlement proceeds would be disbursed to priority wage claimants. The net benefit to this estate is still $650,000.

**3.** This sum also includes an administrative expense priority claim of $1,200,000.

expended time and resources as if the estate was going to recover $30,000,000 at the end of the day was equally unreasonable. Furthermore, there were two events that transpired during the course of these adversary proceedings that should have alerted Morrell to the weakness of his position. Unfortunately for Morrell he did not heed the warning signs.

The first event occurred on or about March 31, 1998, when Northwest filed a suggestion of fraud on the record. The filing indicated that certain principals of the Debtors admitted to committing fraud on Northwest prior to the initial bankruptcy filing. Such an event, if true, clearly hampered the Trustee's case because he no longer possessed "clean hands" which was a prerequisite to the equitable relief he sought.

The second event was my December 8, 1998, Decision on Summary Judgment. I granted Northwest's Motion for Summary Judgment and dismissed the Trustee's claims under the Minnesota Franchise Act because there was no basis in law for such claims. *See O'Donnell v. Northwest Airlines, Inc. (In re Northeast Exp. Regional Airlines, Inc.)*, 228 B.R. 53, 58–61 (Bankr. D.Me.1998). In that same decision, I also granted Northwest's Motion for Summary Judgment in A.P. No. 94–02058, which sought to surcharge Northwest the sum of $1,129,382 for post-petition liabilities incurred by the Debtors. Again I found that the Trustee's claims had no basis in law. *Id.* at 61–62. The foundation upon which the Trustee's monumental claims were founded was severely eroded, yet Morrell continued in litigation mode.

 At the end of the day, once all of the Northwest litigation was resolved either by compromise or by my December 8, 1998 Order dismissing some of the Trust-

ee's claims, the estate is left with a net *tangible* benefit of $650,000.[4] If the Trustee's final application were allowed as filed, his compensation would exceed $665,000, leaving the estate with a net deficit. Given this scenario, I feel compelled to remind the Applicant that "[i]t is fundamental that the bankruptcy process is for the benefit of the debtor and the creditors, not the professionals." *In re Gilead Baptist Church,* 135 B.R. 38, 41 (Bankr.E.D.Mich. 1991), *rev'd on other grounds,* 806 F.Supp. 644 (E.D.Mich.1992). While I acknowledge that professionals employed in a bankruptcy case are not required to guaranty success, they must still exercise reasonable judgment in the positions they take. Here, it was unreasonable for Morrell to think that such specious litigation would warrant the inordinate amount of time spent by the Applicant at the expense of the estate. *See In re Taxman Clothing Co.,* 49 F.3d 310, 315 (7th Cir.1995) ("the care, diligence, and skill that a lawyer for the debtor's estate, ... like the trustee himself, ... is required to bestow as part of his fiduciary duty is not merely care, diligence, and skill in the prosecution of the estate's claims. It is also care, diligence, and skill in deciding which claims to prosecute, and how far").

Giving Mr. Morrell the benefit of many doubts, I will allow all time entries up to and including May 12, 1998, the last day of the mediation session. That sum amounts to $285,197. I will also allow all the time expended by the Applicant in compromising Adversary Proceeding Nos. 94–02032, 94–02033, and finalizing the instant fee application. That amounts to an additional $12,805. Accordingly, Morrell's final fee application is allowed in the amount of $298,002 for fees and $2,744.22 for ex-

---

4. I say tangible because while acknowledging the waiver of the Northwest claims totaling $10,000,000, the likelihood that there would have been a distribution on these claims is nil. Northwest, in reality, gave up nothing. The only potential benefit was Northwest's waiver of its $1,200,000 administrative priority

claim. If that were allowed, the case would certainly have been administratively insolvent and the professionals would have gotten paid on a prorata basis. Therefore, the only true recipients of this benefit is other administrative expense creditors like Morrell and others similarly situated.

penses. Combined with the other amounts received to date, Mr. Morrell and his firm will receive 70% of the net settlement proceeds derived from the Northwest Litigation—clearly the lion's share.

One last point needs to be addressed. On July 1, 1999, the Applicant wrote to the Court bringing to my attention the case of *Donaldson Lufkin & Jenrette Securities Corp. v. National Gypsum Co. (In re National Gypsum Co.)*, 123 F.3d 861 (5th Cir.1997). Morrell stated that it may be pertinent to his pending application. I disagree.

In *National Gypsum,* the debtor retained the services of a professional and agreed in the retention agreement that the professional would be paid $125,000 per month. *Id.* at 862. The bankruptcy court approved the application to employ the professional upon the terms and conditions set forth in the retention agreement. *Id.* Upon consideration of the professional's final fee application, the bankruptcy court reduced the professional's fees by $400,000 based upon hourly compensation that had been awarded in similar bankruptcy cases in the district. *Id.* On appeal, the district court affirmed and the Fifth Circuit Court of Appeals reversed, finding that the bankruptcy court's review of the application should have been done under 11 U.S.C. § 328 and not Section 330. *Id.* Because the bankruptcy court gave prior approval to the compensation when the professional was hired, the court could only change the terms and conditions of employment if they proved "to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." *Id.* (*quoting* 11 U.S.C. § 328).

In the instant case, the Order approving Morrell's application to be employed states that:

> it is hereby ordered, adjudged and decreed that the Trustee be and hereby is authorized to employ Eaton, Peabody, Bradford & Veague, P.A. as litigation counsel in the aforementioned adversary

proceedings, with compensation for fees and expenses being determined as set forth in the Application, *subject to review and approval by this Court.*

Order Authorizing The Trustee to Employ Eaton, Peabody, Bradford & Veague, BK Nos. 94–20409 & 94–20410, June 21, 1995 (emphasis added). The application to employ sets out the compensation as follows:

> 6. Because fees incurred and expenses charges by said firm may be charged against funds received by the estate to date if the prosecution of the causes of action is unsuccessful, thus reducing payments to unsecured creditors, the Trustee has negotiated a modified contingent fee arrangement with EPB & V. In representing the Trustee in connection with the causes of action, EPB & V has agreed to compensation for services rendered in connection with those causes of action equal to the greater of a blended rate of $125 per hour times actual hours expended or twenty-five percent (25%) of the amount recovered by the Trustee from the causes of action.... *All fees and expenses shall remain subject to review and approval by this Court.*

Application for Approval of Employment of Attorney for Adversarial Proceedings, BK Nos. 94–20409 & 94–20410, p. 2, ¶ 6, dated May 23, 1995 (emphasis added).

I believe that the express provisions in both the Application and the Order approving the Application stating that "all fees and expenses shall remain subject to court approval" clearly establish that the Applicant and the Court anticipated review under Section 330. Furthermore, unlike *National Gypsum,* the instant application contains no fixed dollar amount for the compensation to be paid and applying *National Gypsum* here would render nugatory the mandate contained in the Application and Order that the Court review and approve the fees.

## CONCLUSION

For the foregoing reasons, the Final Application for Compensation of Stephen G. Morrell, Esq. and the firm of Eaton, Peabody, Bradford & Veague, is APPROVED in following amounts: (1) $298,002 for fees; and (2) $2,744.22 for expenses. These sums are in addition to amounts previously awarded to the Applicant.